**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
ESTATE OF OMAYRA SOBERAL,               :
ET AL.,                                 :
                    Plaintiffs,         :
                                        :
        v.                              :        CIVIL ACTION NO. 04-2788 (JAP)
                                        :
CITY OF JERSEY CITY, ET AL.,            :
                                        :        **OPINION**
                    Defendants.         :
_____:


APPEARANCES:

John S. Furlong, Esq.
Furlong and Krasny
Mountain View Office Park
820 Bear Tavern Road/Suite 304
West Trenton, NJ 08628
        Attorneys for Plaintiffs

Benjamin Clarke, Esq.
Steven C. Mannion, Esq.
DeCotis, FitzPatrick, Cole & Wisler, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
        Attorneys for Defendants DeFazio
        Stoma, and the Hudson County
        Prosecutor's Office

PISANO, District Judge.

Before the Court is a motion to dismiss or in the alternative motion for summary judgment filed by Defendants, the Hudson County Prosecutor's Office (the "Prosecutor's Office"), Prosecutor Edward DeFazio, and Assistant Prosecutor Peter Stoma.[1]  By order dated May 22, 2006, the Court gave the parties formal notice that it intended to consider matters outside the pleadings in ruling upon the instant motion and thus, would treat the motion as a motion for summary judgment.  See Fed. R. Civ. P. 12(b).  The Court gave the parties until June 22, 2006 to submit any additional documents for the Court's consideration.  The Court has considered all of the written submissions and decides this motion without oral argument.  See Fed. R. Civ. P. 78.  For the following reasons, Defendants' motion for summary judgment is granted.[2]

## I.    **Factual History**[3]

This case stems from a tragic set of events which ended in the death of Omayra Soberal.  Omayra Soberal and Jersey City Police Officer Julio Reyes were involved in a romantic relationship and lived together in Jersey City, New Jersey.  On October 16, 2002, Soberal called the police to report that Officer Reyes was harassing her for breaking up with him.  As a result of

---

[1]  Plaintiffs also named as defendants the Estate of Julio Reyes, the City of Jersey City, the Jersey City Police Department, and numerous employees of the Jersey City Police Department.  These defendants did not join in the instant motion.  Accordingly, references to the "Defendants" in this opinion only refer to the Prosecutor's Office, Prosecutor DeFazio, and Assistant Prosecutor Stoma.

[2]  Jurisdiction is premised on 28 U.S.C. § 1331.

[3]  This recitation of the facts is limited and tailored to the precise allegations against the Prosecutor's Office, Prosecutor DeFazio, and Assistant Prosecutor Stoma.

this incident, Soberal filed a domestic violence civil complaint and obtained a temporary restraining order against Officer Reyes.[4]  In response to this incident, the Jersey City Police Department (the "Police Department") immediately suspended Officer Reyes from duty and confiscated his on-duty and off-duty firearms.

Soberal withdrew the domestic violence charge and the restraining order against Officer Reyes on October 25, 2002.  Accordingly, the Honorable Hector R. Velazquez dismissed the charges against Officer Reyes.

On October 29, 2002, Lieutenant James Blake of the Police Department interviewed Soberal to determine if she would be concerned for her safety should Officer Reyes be reinstated and rearmed with his weapons.  Soberal indicated that she was not concerned for her safety and signed a pre-printed consent form for the return of weapons to Officer Reyes.

Plaintiffs claim that they believed that a representative from the Prosecutor's Office, specifically, Assistant Prosecutor Peter Stoma, the Prosecutor's Office's liaison to the Police Department on matters relating to police officers charged with domestic violence offenses, was present at this interview.  Plaintiffs' belief stems from the fact that the pre-printed consent form previously used by the Police Department and signed by Soberal states, "Assistant Prosecutor has advised me that _____ [filled in as "P.O. Julio Reyes Jr."] may very well present a threat to my mental or physical well being in the future."  See Stoma Certification, Exhibit E.  Lieutenant Blake testified at his deposition that no assistant prosecutor was present.  See Blake Deposition at 25:15 - 26:4.  Assistant Prosecutor Stoma testified that he was not present at this meeting and that "[i]f there was an assistant prosecutor that would have done it, it would have been me."  See

---

[4]  Soberal declined to file formal criminal charges against Officer Reyes.

3

Stoma Deposition at 39:23 - 43:18, 62:4-17; Stoma Certification at ¶ 17.  The consent form at issue was signed by Lieutenant Blake.  The form was not signed by Assistant Prosecutor Stoma or any other representative from the Prosecutor's Office.

Subsequent to the meeting between Lieutenant Blake and Soberal, the Police Department's Internal Affairs Unit (the "IAU") forwarded to the Prosecutor's Office a memorandum from Lieutenant Hugh Donaghue of the IAU dated October 30, 2002.  See Stoma Certification, Exhibit E.  In this memorandum, Lieutenant Donaghue outlined the dismissal of the domestic violence charges against Officer Reyes and Soberal's representation that she had no concern for her safety should Officer Reyes be rearmed.  He requested, on behalf of the IAU, that Officer Reyes be returned to duty and rearmed.  See id.  This request was directed to the Prosecutor's Office because, pursuant to the guidelines set forth by the Attorney General in Attorney General Law Enforcement Directive No. 2000-3, when a police officer has been charged with domestic violence and relieved of his duties, the appropriate county prosecutor's office determines when and whether the officer should be reinstated and rearmed with his firearms.  According to this directive, "a County Prosecutor may authorize the return of the seized weapons subject to conditions, if any, the Prosecutor determines necessary."  See Stoma Certification, Exhibit A at § IV.D.

Thereafter, on November 5, 2002, at the direction of the Police Department, Dr. Amie Wolf-Mehlman, a licensed psychologist, examined Officer Reyes.  Dr. Wolf-Mehlman made the following findings with respect to Officer Reyes:

(1)     Officer Reyes is basically fit for duty.  He demonstrates no mental disorders or significant clinical symptoms at this time, although there are problems with stress with regard to relationships.

4

(2)      Officer Reyes is experiencing some anxiety and would certainly benefit from, and should be required to attend therapy sessions and stress management sessions in order to stabilize himself with regard to his anxiety and relationship difficulties.

(3)      Officer Reyes is not considered a danger to self or others at this time.

(4)      Officer Reyes should continue in counseling, as well as stress management, for at least three to six months.  He should have his treating professional send regular reports to his department signifying that:  (a) he is coming to sessions; (b) that he is, or is not serious about treatment; (c) that he is, or is not making progress; and (d) whether or not any changes have occurred which would constitute danger to self or others.

(5)      Officer Reyes should not terminate treatment until it is mutually agreed upon between himself and the treating physician.

(6)      On conclusion of treatment, Officer Reyes should submit a letter from his treating physician certifying that he is fit to return to full duty.

(7)      It would be very important to consider removing this individual's weapons and consider him unfit for duty if, in the future, there is any evidence of any problems between himself and others that involve anger or aggression.

Stoma Certification, Exhibit F at 18.  Dr. Wolf-Mehlman's report was forwarded to Assistant

Prosecutor Stoma as a supplement to the rearming request on or about November 17, 2002.

Assistant Prosecutor Stoma, in receipt of Lieutenant Donaghue's request and Dr. Wolf-

Mehlman's report, was tasked with recommending to Prosecutor Edward DeFazio whether

Officer Reyes should be reinstated and rearmed.  Assistant Prosecutor Stoma considered the

following in this regard:

(1)      there were two previously reported incidents of domestic violence against Officer Reyes;[5]

---

[5] On one previous occasion, the mother of Officer Reyes's oldest children obtained a temporary restraining order against him.  Further, on August 24, 2002, Soberal called the police to report that Officer Reyes harassed and slapped her.

(2)     Officer Reyes had no prior history of misusing any firearm;

(3)     Officer Reyes had no substantiated history of physical violence;[6]

(4)     Officer Reyes had no known substance abuse problems;

(5)     Officer Reyes had no record of disciplinary infractions on the job;

(6)     Soberal withdrew her domestic violence charge against Officer Reyes;

(7)     Soberal consented to the return of Officer Reyes's firearms;

(8)     Soberal believed that Officer Reyes did not pose a threat to her safety;

(9)     Dr. Wolf-Mehlman determined that Officer Reyes was basically fit for duty and did not pose a danger to others; and

(10)    The Police Department recommended that Officer Reyes be reinstated and rearmed.

See Stoma Certification at ¶ 13.  After considering these factors, Assistant Prosecutor Stoma recommended that Officer Reyes be reinstated and rearmed on the condition that he attend stress and anger management counseling.  Prosecutor DeFazio approved this decision.

Plaintiffs claim that Sergeant Alexander Forsythe and Deputy Chief of Internal Affairs Victor Perez of the Police Department each prepared separate internal affairs documents in November, 2002, which expressed doubts as to Officer Reyes's fitness to return to duty. Specifically, Sergeant Forsythe prepared a memorandum on November 13, 2002 addressed to Deputy Chief Perez.  In this document, Sergeant Forsythe indicated some discrepancies in Dr. Wolf-Mehlman's report.  He recommended to Deputy Chief Perez that as a penalty for his actions, Officer Reyes have deducted from his accumulated time all days he was unable to

---

[6]  In making this determination, Assistant Prosecutor Stoma noted that Soberal claimed that Officer Reyes slapped her once on August 24, 2002.  See Stoma Certification at ¶ 13.

perform his duties due to his inability to possess a weapon.  As to the ultimate decision to rearm Officer Reyes, Sergeant Forsythe noted that the Prosecutor's Office makes the final decision.  However, he attached Officer Reyes's personnel file to the memorandum to "possibly assist in the decision making process."  See Stoma Certification, Exhibit L.

Further, Deputy Chief Perez apparently made certain written comments on November 13, 2002 purportedly in response to Sergeant Forsythe's memorandum.  See Plaintiffs' Brief, Exhibit B.  The Court is hesitant to say with certainty that Deputy Chief Perez made the comments because the handwriting in the document is not entirely legible.  However, giving Plaintiffs' the benefit of the doubt, in the document, Deputy Chief Perez stated that it cannot be determined if, presumably Officer Reyes, is fit or unfit to return to duty.  He noted that the Police Department should "[r]equest more (Psychologist) from Amie B. Wolf-Mehlman P.H.D."  It appears that Deputy Chief Perez's comments were supposed to be forwarded to then-Chief of Police Peter Behrens.  See id.

Assistant Prosecutor Stoma stated at his deposition that he never saw those documents and thus, they did not factor into his recommendation to rearm Officer Reyes.  See Stoma Deposition at 31:8 - 32:14; Stoma Certification at ¶ 19.  Further, Defendants' attorney, Steven C. Mannion, Esq., certified that these documents were not among the documents in the Prosecutor's Office files and records produced in accordance with this matter.  See Mannion Certification at ¶ 3.

The Chief of Police, Peter Behrens, did not send a request to rearm Officer Reyes to the Prosecutor's Office.  This is technically contrary to Directive 2000-3 which requires that the "chief of the law enforcement agency where the officer is employed shall . . . conduct an

investigation into the officer's background and shall recommend to the appropriate County

Prosecutor's Office whether the officer should be permitted to carry weapons and what

conditions, if any, should be imposed for the return of weapons . . . ."  Stoma Certification,

Exhibit A at § III.E.1; see also Blake Deposition at 46:13 - 47:17.

       However, both Lieutenant Blake and Assistant Prosecutor Stoma testified that in practice,

it was not unusual for the Prosecutor's Office to act on a request from the IAU, as opposed to a

request directly from the Chief of Police.  The following exchange occurred at Lieutenant

Blake's deposition:

> Q:    Okay.  Were there any circumstances under which you were aware that internal
> affairs would contact the prosecutor's office directly to request the rearming of an
> individual?
> A:    If there was certain conditions or if there was certain questions.  We worked in
> conjunction with them on many different circumstances, so it wouldn't be
> unusual.

Blake Deposition at 46:22 - 47:5.  The following exchange occurred at Assistant Prosecutor

Stoma's deposition:

> Q:    Did you look to, A, whether or not the chief of police of the department of the
> person who was involved was recommending?
> A:    Yes, absolutely.
> Q:    In every case?
> A:    Well, not the chief of police.
> Q:    Over — some responsible person in that department.
> A:    Somebody from the department who could speak for the chief law enforcement
> officer in the municipality.

Stoma Deposition at 72:2-12.  Accordingly, in this case, Assistant Prosecutor Stoma acted on the

request to rearm Officer Reyes submitted by Lieutenant Donaghue, of the IAU, on behalf of the

IAU.

       On December 3, 2002, Assistant Prosecutor Stoma sent a letter to Lieutenant Donaghue

stating that the Prosecutor's Office agreed to allow Officer Reyes to return to duty and be

rearmed if he attended stress management counseling.  By memorandum dated December 5,

2002, Lieutenant Donaghue confirmed to the Prosecutor's Office that the Police Department

made arrangements for Officer Reyes to attend stress management counseling.  Officer Reyes

was reinstated and rearmed.  The Prosecutor's Office received periodic reports from the Police

Department indicating that Officer Reyes was regularly attending counseling sessions and

making significant progress.  Defendants had no further involvement in this matter.

On March 3, 2003, three months after Officer Reyes returned to duty, Soberal went to the

Police Department's West District Police Station to report that Officer Reyes was again harassing

her.  She sought and obtained a temporary restraining order against Officer Reyes.  Police

officers escorted Soberal out of the police station and placed her in a police car.  Officer Reyes,

who had arrived at the police station, ran outside and opened the door to the police car.  He shot

Soberal with his service weapon and then fatally shot himself.  After living in critical condition

for six days, Soberal died of her gunshot wounds on March 9, 2003.

## II.    <u>Procedural History</u>

Plaintiffs, the Estate of Omayra Soberal; Rafael Soberal, the brother of Omayra Soberal

and Administrator Ad Prosequendum of the Estate of Omayra Soberal; and Giovanni Alberto

Germonsen and William Gonzalez, the sons of Omayra Soberal brought the instant lawsuit on

June 14, 2004.  They filed an amended complaint on August 2, 2005 and a second amended

complaint on November 21, 2005.

In their second amended complaint, Plaintiffs allege that Defendants, in their individual

and official capacities, violated Soberal's substantive due process rights pursuant to 42 U.S.C. §

9

1983 (Count II, IV); failed to properly train and supervise Jersey City police officers (Count III);

facilitated Officer Reyes's intentional homicide of Soberal (Count V); caused Soberal conscious

pain and suffering (Count VI); and contributed to Soberal's wrongful death (Count VII). [7]

Plaintiffs seek compensatory and punitive damages.

After Defendants filed the instant motion, Plaintiffs dismissed various claims asserted in

the second amended complaint.  Plaintiffs dismissed Count III against Prosecutor DeFazio,

Assistant Prosecutor Stoma, and the Prosecutor's Office.  Plaintiffs also dismissed all claims

against these Defendants in their official capacities.

Accordingly, for purposes of this motion, the Court will only consider whether

Defendants (1) violated 42 U.S.C. § 1983 by infringing upon Soberal's substantive due process

rights while acting in their individual capacities (Counts II and IV); (2) violated New Jersey law

by facilitating Officer Reyes's intentional homicide of Soberal (Count V), causing Soberal

conscious pain and suffering (Count VI), and contributing to Soberal's wrongful death (Count

VII).

## III.   <u>Standard of Review</u>

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil

Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

substantive law identifies which facts are critical or "material."  <u>Anderson v. Liberty Lobby, Inc.</u>,

---

[7]  Plaintiffs bring Count I solely against the City of Jersey City, Jersey City Police
Department, and the named employees of the Jersey City Police Department.

477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial.  Id. at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings.  See Celotex, 477 U.S. at 324.

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  Anderson, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  Big Apple BMW v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992).  In fact, the Supreme Court has specifically emphasized that a principal purpose of the summary judgment rule "is to isolate and dispose of factually unsupportable claims or defenses."  Celotex, 477 U.S. at 323-24.

## IV.   **Legal Discussion**

Plaintiffs claim that Defendants (1) violated 42 U.S.C. § 1983 by infringing upon Soberal's substantive due process rights in their individual capacities; and (2) violated New Jersey law by facilitating Officer Reyes's intentional homicide of Soberal, causing Soberal

11

conscious pain and suffering, and contributing to her wrongful death.   The Court will consider each of these claims in turn.

## A.   42 U.S.C. § 1983

Plaintiffs claim that Defendants, while acting in their individual capacities, violated their rights pursuant to 42 U.S.C. § 1983.[8]  A state official may be sued for monetary damages in his or her individual capacity.  See Hafer v. Melo, 502 U.S. 21, 25 (1991).  A section 1983 suit against a state official in his or her individual capacity "imposes individual liability upon a government officer for actions taken under color of state law."  Id.; see also Kirkland v. Morgievich, No. 04-1651, 2005 WL 3465669, at *3 (D.N.J. Dec. 19, 2005).[9]  To establish personal or individual liability in a section 1983 action, a plaintiff must show "that the official acting under color of state law caused the deprivation of a federal right."  Hafer, 502 U.S. at 25; Kentucky v. Graham, 473 U.S. 159, 166 (1985).  This is because section 1983 itself is not a source of substantive rights, but provides a vehicle for vindicating the violation of rights created by the United States Constitution or federal law.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997).

In this case, Plaintiffs allege that Defendants violated Plaintiffs' substantive due process

_____

[8]  Section 1983 states in relevant part: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."  42 U.S.C. § 1983.

[9]  The "under color of state law" element of section 1983 is similar to the state action requirement of the Fourteenth Amendment in that it excludes merely private conduct from the parameters of section 1983.  See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999).  This element in not in dispute.

rights under the Fourteenth Amendment.  The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  Plaintiffs claim that Defendants deprived Soberal of her due process rights by authorizing the Police Department to reinstate and rearm Officer Reyes. Their theory of recovery is known as the "state created danger doctrine."

### 1.    The State Created Danger Doctrine

The United States Supreme Court held in DeShaney v. Winnebago County Dept. of Social Services, that the state has no affirmative obligation under the Due Process Clause to protect an individual from private violence.  489 U.S. 189, 196-97 (1989) (holding that state had no constitutional duty to protect child from his father after receiving reports of child abuse).  In Kneipp v. Tedder, the Third Circuit recognized an exception to the Deshaney rule termed the "state created danger doctrine."  95 F.3d 1199, 1211 (3d Cir. 1996)  Under the state created danger doctrine, a state actor violates the Due Process Clause when he creates a danger to an individual or renders the individual more vulnerable to danger than he would have been in the absence of state intervention.  Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006).[10]

---

[10]  Courts which have adopted the state created danger doctrine, including the Third Circuit, interpreted their authority for doing so from language in DeShaney.  In DeShaney, the Court held that the state had no duty to protect a child from his abusive father, despite having received reports of the abuse.  See DeShaney, 489 U.S. at 201.  The Court emphasized, that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  Id.

Courts have also recognized a second exception to the general rule that states do not have a duty to protect citizens from the actions of private individuals.  A plaintiff may recover on a substantive due process claim where the state enters into a "special relationship" with a particular

The Third Circuit has adopted four essential elements that a plaintiff must establish to state a meritorious substantive due process claim under the state created danger theory.   These elements, originally set forth in <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1152 (3d Cir. 1995), and refined through numerous cases, have been recently recited in <u>Bright v. Westmoreland County,</u> 443 F.3d 276 (3d Cir. 2006).  The Third Circuit held in <u>Bright</u> that a plaintiff must establish the following to establish a state created danger claim:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts" or a "member of a discrete class of person subject to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Bright</u>, 443 F.3d at 281 (internal citations omitted).

Defendants claim that Plaintiffs have not established any of these elements.  For the following reasons, the Court finds that Plaintiffs have not established the second and fourth elements of the state created danger test, and thus, Defendants' motion for summary judgment on Plaintiffs' section 1983 claims must be granted.  The Court accordingly declines to determine whether Plaintiff has established the first and third elements set forth above.

---

citizen and thereafter, fails to protect the health and safety of that citizen.  <u>See</u> <u>Morse v. Lower Merion School District</u>, 132 F.3d 902, 907 (3d Cir. 1997).  Plaintiffs do not invoke this exception.

### a.      Defendants' Conduct does not Shock the Conscience

With respect to the second element, Plaintiffs fail to establish that Defendants acted with a degree of culpability that "shocks the conscience."  See Bright, 443 F.3d at 281; see also Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999) ("To generate liability, executive action must be so ill-conceived that it "shocks the conscience.").  There is no precise definition for the term "shocks the conscience."  Instead, a court must look to the circumstances of each particular case and determine whether the purported conduct shocks the conscience.  See County of Sacramento v. Lewis, 523 U.S. 833, 850-51 (1998); see also Miller, 174 F.3d at 375 ("The exact degree of wrongfulness necessary to reach the "conscience-shocking" level depends upon the circumstances of a particular case.").[11]

Courts have consistently held that the state's mere negligence will not "shock the conscience" for purposes of establishing a substantive due process claim.  See, e.g., Lewis, 523 U.S. at 848-49 ("liability for negligently inflicted harm is categorically beneath the threshold of

---

[11]  In Brown v. Commw. of Pennsylvania Dept. Of Health Emergency Medical Services Training Institute, the Third Circuit stated that the "shock the conscience" standard applies in substantive due process cases only where the "state actor had to act with urgency."  318 F.3d 473, 480 (3d Cir. 2003) (applying "shock the conscience" standard to situation where emergency personnel failed to save choking infant).  The Brown court's use of the term "shocks the conscience" appears to be at odds with the use of that term in later Third Circuit cases.

For example, in Schieber v. City of Philadelphia, 320 F.3d 409 (3d Cir. 2003), which was decided on month after Brown, the court emphasized that conduct may be conscious shocking even if the state had the opportunity to make a deliberate decision.  See Schieber, 320 F.3d at 417-19 (" 'Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . .' " (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998)).  Further, in Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006), the Third Circuit specifically stated that the second element of the state created danger test is whether "a state actor acted with a degree of culpability that shocks the conscience."  Thus, in examining the state created danger doctrine and in particular, the second element, the Court follows the dictates of Schieber and Bright which are more recent precedents than Brown.

constitutional due process"); Schieber v. City of Philadelphia, 320 F.3d 409, 419 (3d Cir. 2003)

("negligence is not enough to shock the conscience under any circumstances"); Hansell v. City of

Atlantic City, 152 F. Supp. 2d 589, 605 n.9 (D.N.J. 2001) (finding that plaintiffs failed to raise a

triable issue of fact under the second element of the state created danger test because at most,

defendants' conduct was negligent).  Further, if the state actor unjustifiably intended that his

conduct injure an individual, such conduct will likely rise to the level of conscience shocking.

See Schieber, 320 F.3d at 418 (" 'conduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking

level' " (quoting Lewis, 523 U.S. at 848-49)).

Whether a defendant's behavior is conscience shocking when a plaintiff's alleged injuries

follow from something more than negligence but less than intentional conduct, " 'is a matter for

closer calls.' " Schieber, 320 F.3d at 418 (quoting Lewis, 523 U.S. at 848-49)).  When a state

actor has the opportunity to make a deliberate and unhurried judgment, deliberate indifference on

the part of the state will generally be sufficient to shock the conscience.  See Lewis, 523 U.S. at

851; Schieber, 320 F.3d at 418.  For example, the Supreme Court has indicated that deliberate

indifference is sufficient to "shock the conscience" in the context of prison officials making

decisions as to an inmate's medical needs.  See Lewis, 523 U.S. at 849-852; see also Nicini v.

Morra, 212 F.3d 798, 811 (3d Cir. 2000) (stating that deliberate indifference standard applies to

claim that social worker failed to properly investigate history of family with whom plaintiff had

been placed for foster care).  This is because in such circumstances, actual deliberation is

possible and the state's responsibility to attend to the inmate's needs does not clash with other

equally important government responsibilities.  See Lewis, 523 U.S. at 851-52; Schieber, 320

F.3d at 418.

On the other hand, when state actors are required to act promptly and under pressure and when state actors are required to make a judgment between competing legitimate interests, more culpability is required to shock the conscience.  See Schieber, 320 F.3d at 419.   In particular, when a state actor engages in hyperpressurized environments such as prison riots or high speed police chases, liability occurs only when a purpose to cause harm is demonstrated. See Lewis, 523 U.S. at 852-54 (stating that a purpose to cause harm is required to show a substantive due process violation in the context of a prison riot or high speed police chase); Miller, 174 F.3d at 375 (" 'A must higher fault standard [than deliberate indifference] is proper when a government official is acting instantaneously and making pressured decisions . . . .  In such instances, liability will only be applied when a "purpose to cause harm is demonstrated.' " (quoting Lewis, 523 U.S. at 854)).

However, when a state is not faced with such a highly pressurized environment, but at the same time, does not have the luxury of proceeding in a deliberate fashion, the type of conduct which will shock the conscience is less clear.  In Miller v. City of Philadelphia, the court recognized that a social worker acting to separate parent and child does not usually act in a hyperpressurized environment, but also does not have the luxury of making deliberate determinations.  See Miller, 174 F.3d at 375.  As a result, for due process liability to attach, a social worker need not have acted with the "purpose to cause harm."  Id.  Instead, a plaintiff must show that the defendant acted with something more than negligence or deliberate indifference. Id.  He must establish that the state engaged in  "gross negligence or arbitrariness."  Id. at 375-76.

The logical problems with this position were pointed out by the Third Circuit in Ziccardi

v. City of Philadelphia, 288 F.3d 57 (3d Cir. 2002).  In Ziccardi, a plaintiff brought suit against the City of Philadelphia and employees of the City's paramedic squad.  Ziccardi, 288 F.3d at 59-60.  He claimed that the paramedics, who were called to tend to the plaintiff following a fall, mishandled him causing permanent quadriplegia.  Id.  The court found that the situation was similar to that in Miller because while the paramedics did not have to make a split-second pressurized decision, they did not have the luxury of proceeding in a deliberate fashion.  See id. at 65.  However, the court in Ziccardi had trouble applying the "gross negligence or arbitrariness" language of Miller.

The Ziccardi court stated that deliberate indifference requires that a plaintiff establish that a defendant consciously disregarded a substantial risk of serious harm.  Id. at 66.  Deliberate indifference is equivalent to the recklessness standard in criminal law.  See Schieber, 320 F.3d at 421.  Gross negligence is a lower level of intent than criminal law recklessness or subjective deliberate indifference.  See Ziccardi, 288 F.3d at 66 n.6.  Thus, the language in Miller is illogical because it insinuates that gross negligence is a higher level of intent than deliberate indifference.  See id.  Furthermore, the Miller court's use of the term "arbitrariness" is not precise because arbitrariness is a general requirement for establishing a substantive due process violation, not a particular degree of intent.  See id.

To resolve this issue, the court in Ziccardi declared that in circumstances similar to Miller and Ziccardi, to prove conscience shocking conduct, a plaintiff must show that the defendant "consciously disregarded, not just a substantial risk, but a great risk that serious harm would result."  Ziccardi, 288 F.3d at 66.  This results in a standard that is more than deliberate indifference but less than intent for circumstances similar to Miller and Ziccardi.

18

The Court need not determine the proper standard to apply to the facts of this case because Plaintiffs' allegations at most sound in negligence.  See, e.g., Schieber, 320 F.3d at 423 (declining to determine whether the intent to harm standard or Miller/Ziccardi standard is required to show conscience shocking behavior where the record "would not support a finding of more than negligence").   Plaintiffs' claim that Defendants improperly decided to rearm Officer Reyes is based on the following:

> (1) Defendants had knowledge of Officer Reyes's prior history of domestic violence;

> (2) an unidentified representative from the Prosecutor's Office, presumably, Assistant Prosecutor Stoma, was present at the October 29, 2002 meeting between Lieutenant Blake and Soberal and purportedly "encouraged" Soberal to consent to the return of Officer Reyes's firearms;

> (3) Defendants violated procedure by acting on the recommendation of Lieutenant Donaghue and not requesting a recommendation from the Chief of Police;

> (4) Defendants received and ignored internal affairs documents prepared by Sergeant Forsythe and Deputy Chief of Internal Affairs Perez in which the officers indicate that it is unclear whether Officer Reyes is fit to return to duty; and

> (5) Defendants ignored the language in Dr. Wolf-Mehlman's report which indicates that Officer Reyes should attend counseling before being returned to duty and rearmed.

None of these claims, either individually or collectively, establish a genuine issue of material fact that Defendants were anything more than negligent in reinstating and rearming Officer Reyes.

First, Defendants admitted that they were aware of the previous incidents of domestic violence involving Officer Reyes.  Assistant Prosecutor Stoma stated that he considered these incidents when he made his decision to rearm Officer Reyes.  He specifically noted that with the exception of Soberal's claim that Officer Reyes slapped her a single time on August 24, 2002, none of these incidents involved physical violence.  Instead, they all involved claims of

harassment.  Further, none of these incidents involved the use of a firearm or threats of use of a firearm.  Soberal herself informed the Police Department that she did not consider Officer Reyes to be a danger to her safety and believed his firearms should be returned to him.  In fact, for approximately three months following Defendants' decision to rearm Officer Reyes, he was making significant progress at counseling and he engaged in no reported incidents of improper behavior.

Second, there is no evidence to support Plaintiffs' bald allegations that Assistant Prosecutor Stoma (or any other prosecutor), was present at the October 29, 2002 meeting between Lieutenant Blake and Soberal.  Both Lieutenant Blake and Assistant Prosecutor Stoma stated in their depositions that neither Assistant Prosecutor Stoma nor any other representative from the Prosecutor's office was present at that meeting.  Plaintiffs fail to offer specific facts which indicate otherwise and instead, simply rest on their belief that an assistant prosecutor was at the meeting.  This is insufficient to create a genuine issue of material fact.  See Fed. R. Civ. P. 56(e); see also Tofano v. Reidel, 61 F. Supp. 2d 289, 292 n.1, 293 n.5, 294 nn. 8 & 9 (D.N.J. 1999) (stating that plaintiff's bald assertions did not created disputed issues of fact).  Even if Assistant Prosecutor Stoma or another prosecutor was present at the meeting, there is no evidence to support Plaintiffs' speculative contention that anyone "encouraged" Soberal to consent to the return of Officer Reyes's firearms.  Instead, the record reveals that Soberal herself withdrew her domestic violence complaint against Officer Reyes and consented to the return of his weapons.

Third, although Directive 2000-3 technically states that the chief of police is to make the recommendation to the Prosecutor's Office as to whether a police officer accused of domestic

20

violence should be rearmed, it was reasonable for the Prosecutor's Office to construe Lieutenant Donaghue's request as being authorized by the chief of police. Both Assistant Prosecutor Stoma and Lieutenant Blake testified that in practice, it was not unusual for the Prosecutor's Office to receive a recommendation from someone other than the Chief of Police who was purportedly acting on the Chief's behalf. In this case, the Prosecutor's Office received a recommendation from Lieutenant Donaghue from the IAU requesting, on behalf of the IAU, that Officer Reyes be rearmed.

The Court is not in a position to adjudicate whether Directive 2000-3 mandates a formal recommendation by the chief of police or whether it permits a Prosecutor's Office to act upon a recommendation it believes was submitted on the chief's behalf. In any event, considering this issue in the light most favorable to Plaintiffs, if the Prosecutor's Office did in fact violate Directive 2000-3, this procedural violation is insufficient to establish that Defendants' conduct shocked the conscience. "Police department guidelines and policies do not create constitutional rights under the substantive due process clause of the Fourteenth Amendment." Neal v. St. Louis County Board of Police Comm'rs, 217 F.3d 955, 959 (8th Cir. 2000). Directive 2000-3 specifically emphasizes that the Attorney General's Guidelines "are not intended to, do not, and may not be invoked to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal. See Stoma Certification, Exhibit A at § VI.

Further, no reasonable jury could find that Defendants' actions in this regard entail sufficient culpability to rise to the level of conscience shocking. See Lewis, 523 U.S. at 855 ("Regardless whether [defendant's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the

conscience . . . .”); <u>Davis v. Twp. of Hillside</u>, 190 F.3d 167,170 (3d Cir. 1999) (holding that

police officer’s violation of police department regulations did not suffice to meet the shock the

conscience test under the due process clause); <u>Ploucher v. City of Philadelphia</u>, No. 94-7036,

1996 WL 677513, at *3 (E.D. Pa. Nov. 19, 1996) (holding that police officer’s violation of police

department directive did not shock the conscience); <u>see also</u> <u>Starr v. Price</u>, 385 F. Supp. 2d 502,

505-06 (M.D. Pa. 2005) (holding that plaintiff failed to establish a state created danger claim

despite fact that officer’s return of gun to individual who later killed four people violated court

order)

      Fourth, despite Plaintiffs’ contentions, there is no evidence in the record that someone at

the Police Department forwarded the two internal affairs documents in question to the

Prosecutor’s Office or that the Prosecutor’s Office received the documents.  Assistant Prosecutor

Stoma stated that he did not receive those documents from the Police Department or otherwise

view those documents before making his recommendation to rearm Officer Reyes.  Further,

Defendants have certified that these documents were not in the Prosecutor’s Office’s files which

were produced during discovery.  Plaintiffs offer no specific facts or affidavits to indicate

otherwise.  <u>See</u> Fed. R. Civ. P. 56(e); <u>see also</u> <u>Hansell</u>, 152 F. Supp. 2d at 605 n.9 (stating that

plaintiff failed to meet second prong of state created danger test because “plaintiffs have not

presented any evidence that [defendant] even received the messages” left by domestic violence

complainant).

      Lastly, with respect to Plaintiffs’ contention that Defendants ignored language in Dr.

Wolf-Mehlman’s report which indicates that Officer Reyes should attend counseling before

being returned to duty and rearmed, the Court notes that Dr. Wolf-Mehlman’s report appears to

be somewhat inconsistent.  She specifically finds that Officer Reyes is "basically fit for duty" and that he is "not considered a danger to self or others."  Dr. Wolf-Mehlman indicated that Officer Reyes showed no evidence of pathology or of physical aggression in the past.  She further stated that Officer Reyes should be required to attend counseling for at least three to six months.  Dr. Wolf-Mehlman suggested that the counselor provide affidavits as to Officer Reyes's progress and recommended that counseling not be terminated until mutually agreed upon by Officer Reyes and the counselor.  Further, Dr. Wolf-Mehlman specifically stated, that it would be "very important to consider removing [Officer Reyes's] weapons and consider him unfit for duty if, in the future, there is any evidence of any problems between himself and others that involve anger or aggression."   A reading of this language indicates that Dr. Wolf-Mehlman is recommending that Officer Reyes be returned to duty and rearmed but that he be required to attend counseling. This is what Assistant Prosecutor Stoma relied upon in making his recommendation.

Dr. Wolf-Mehlman also states in her report that "[o]n conclusion of treatment, [Officer Reyes] should submit a letter from his treating physician certifying that he is fit to return to full duty."  Plaintiffs contend that this statement should be construed as a recommendation from Dr. Wolf-Mehlman to wait to reinstate and rearm Officer Reyes until he completes counseling sessions.  However, this statement could be read consistently with the other statements.  Dr. Wolf-Mehlman may have been recommending that Officer Reyes be returned to duty but required to attend counseling sessions and as an official certification, Officer Reyes's treating physician should be required to submit a certification that he is "fit to return to full duty."  In any event, given Dr. Wolf-Mehlman's statements that Officer Reyes was "basically fit to return to duty" and that he was not a danger to himself and others, no reasonable jury could find that

23

Defendants' interpretation of her report was conscious shocking.

In hindsight, it becomes clear that Officer Reyes was in fact a danger to Soberal and ultimately a danger to himself.  It is natural for all who hear of these truly tragic circumstances to want to place blame on someone for what happened.  However, prosecutors and other government officials have to make these tough decisions every day.  Given the information that Defendants possessed at the time they authorized the Police Department to reinstate and rearm Officer Reyes, they made a good faith judgment required by their official responsibilities.  See Schieber, 320 F.3d at 420; Cf. Miller v. New Jersey, 144 Fed. Appx. 926, 2005 WL 1811820, at *3 (3d Cir. Aug. 2, 2005) (indicating that county prosecutor's decision to rearm police officer on condition he attend counseling after he was the subject of domestic violence complaint was within her discretion).  This was a difficult decision considering that Defendants had to weigh Soberal's interest in personal safety and Officer Reyes's interest in being reinstated to duty.  Clearly, whether the appropriate standard of conscience shocking behavior is deliberate indifference, intent to harm Soberal, or, as discussed in Miller and Ziccardi, something in between, Defendants' conduct in this case does not rise to these standards.  See Schieber, 320 F.3d at 421 ("While one can argue with the benefit of hindsight that these officers exercised poor judgment and were thus guilty of negligence, a reasonable trier of fact could not find that they were deliberately indifferent to Schieber's constitutional rights."); Nicini v. Morra, 212 F.3d 798, 815 (3d Cir. 2000) (affirming district court's dismissal of substantive due process claim because the evidence "not only falls short of the demanding standard for deliberate indifference . . . it also fails to establish that [defendant] was more than negligent, if it even establishes that").

At best, and the Court is by no means making this a conclusive finding, Defendants'

failure to request a formal recommendation by the chief of police (which would have likely

revealed the existence of the two internal affairs documents) and failure to request more

information from Dr. Wolf-Mehlman considering her inconsistent statements could be

characterized as negligent conduct.  Since negligent conduct can never be conscience shocking,

the Court grants Defendants' motion for summary judgment on Plaintiffs' section 1983 claims

against Defendants.

<b>b.      Defendants did not Create the Danger to Plaintiffs</b>

Plaintiffs also fail to establish the fourth element of the state created danger test, namely,

that Defendants affirmatively used their authority in a manner that created a danger to Soberal or

rendered her more vulnerable to danger than had the state not acted at all.  Plaintiffs claim that

Defendants' affirmative act of reinstating and rearming Officer Reyes created a danger to Soberal

or rendered her more vulnerable to danger because Officer Reyes ultimately used his firearm to

kill Soberal.  However, these allegations are insufficient to establish the fourth element.

After Soberal filed a domestic violence complaint against Officer Reyes on October 16,

2002, the Police Department immediately suspended Officer Reyes from duty and confiscated

both his on-duty and off-duty firearms.  The Police Department and Prosecutor's Office, pursuant

to Directive 2000-3, continued Officer Reyes's suspension and retained his weapons for almost

two months, despite the fact that Soberal withdrew her domestic violence charges and consented

to the return of his weapons approximately two weeks after the incident.  Had the state not acted

at all to protect Soberal, Officer Reyes's weapons would have never been taken away in the first

place.  Consequently, there would have been no occasion for Defendants to authorize the return

of Officer Reyes's weapons.  Thus, Soberal was in no worse position on the day of her death than

25

she would have been if the state had not acted at all.

This point was emphasized by the Supreme Court in <u>DeShaney</u>.  In that case, the state took temporary custody of a child after receiving reports that he was being abused, but later returned the child to his father.  His father subsequently abused the child causing permanent brain damage.  The Court stated:

> [w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. *That the State once took temporary custody of Joshua does not alter the analysis*, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

<u>DeShaney</u>, 489 U.S. at 201.

Similarly, Defendants were certainly aware of the dangers that Soberal faced in the free world.  She was involved in a relationship involving domestic violence.  However, Defendants did not create the danger to Soberal.  That danger was created by Officer Reyes, who harassed Soberal long before Defendants became involved in this matter.  That Defendants essentially confiscated Officer Reyes's firearms and later returned them to him placed Soberal in no worse position than she would have been had Defendants not acted at all.  Although Defendants protected Soberal by retaining Officer Reyes's firearms for months after Soberal filed domestic violence charges, protection Soberal herself claimed she did not need, this did not make Defendants "the permanent guarantor" of Soberal's safety.  <u>See</u> <u>Bright</u>, 443 F.3d at 285 (finding that murder victim was at no greater risk before police confronted the man who sexually abused her sister than she was before the confrontation); <u>Wyatt v. Krzysiak</u>, 82 F. Supp. 2d 250, 259-260 (D. Del. 1999) (holding that plaintiff who was injured in accident while driving under the

influence of alcohol a half-hour after being pulled over and released by a police officer was at no

greater risk before she was stopped and released by the police officer than she would have been

had the officer not intervened at all).

The Third Circuit's unpublished decision in Green v. City of Philadelphia is helpful on

this point.  No. 03-2368, 92 Fed. Appx. 873, 2004 WL 474140 (3d Cir. Mar. 10, 2004).  In that

case, Fitz Green was involved in a relationship with Evelyn White.  Id. at *1.  In June, 2000,

police investigated a report of a domestic dispute involving Green and White.  Id.  During this

investigation, Green informed the officers that White was violent and had threatened him with a

gun.  Id.  The officers confiscated White's gun.  Id.  When it appeared that they had the situation

under control, they returned White's gun to her.  Id. at *1-2.  On July 4, 2000, White shot Green

in the leg with the gun.  Id.  The Court dismissed Green's substantive due process claim for

failure to establish the fourth element of the state created danger test.   The Court stated that

when the officers returned the gun to White, they "placed Green in no worse position than he

would have been in without their temporary intervention, and that temporary intervention did not

create any guarantee of Green's future safety."  Id. at *2.  The Court also noted that the shooting,

which happened one month after the officers confiscated and then returned White's gun, was too

remote in time for them to have created the danger to Green.  See id.

Further instructive is the district court decision in Starr v. Price, 385 F. Supp. 2d 502

(M.D. Pa. 2005).  On March 14, 2002, officers arrived at the home of Michael and Raienhna

Bechtel following a report of domestic violence.  Id. at 504.  Michael informed the officers that

he possessed two firearms but both Michael and Raienhna denied that he used the weapons in the

incident.  Id.  The officers confiscated the firearms and took them to the police station.  Id.  On

March 18, 2002, Raienhna sought and obtained a restraining order against Michael which

prohibited him from possessing any firearms and specifically stated that if any of his firearms

where in police custody, they should not be returned to Michael until further court order.  Id. at

505.  On April 15, 2002, Michael appeared at the police station to retrieve his guns.  Id.  A state

police officer returned two guns to Michael.  Id.  Four months later, Michael used one of the guns

to kill Raienhna and three others.  Id.   The court in Starr found that plaintiff failed to establish a

state created danger claim because "although the defendants took custody of the gun, when they

returned it to Michael they placed Raienhna . . . in no worse position than had they not acted at

all."  Id. at 508.[12]

     Thus, for the foregoing reasons, the Court grants summary judgment in favor of

---

[12]  As an additional point, the Third Circuit recently made clear that liability for
substantive due process violations must be predicated on the state's *affirmative acts*.  See Bright,
443 F.3d at 282 ("we have never found a state-created danger claim to be meritorious without an
allegation and subsequent showing that state authority was affirmatively exercised"); see also
Smith v. Town of East Haven, No. 3:01-CV-1375, 2005 WL 677284, at *5 (D. Conn. Mar. 22,
2005) (finding no liability under state created danger doctrine where police officers failed to
confiscate guns from individual who was required to surrender such guns to the state pursuant to
a domestic violence restraining order); Hansell v. City of Atlantic City, 152 F. Supp. 2d 589, 608
(D.N.J. 2001) (holding that plaintiffs did not state substantive due process claim based on police
officers' failure to investigate domestic violence incident).

     It would be nonsensical for the Court to say that had the state not responded at all to
Soberal's complaints of domestic violence by Officer Reyes, Defendants would not violate the
due process clause; however, since Defendants took away Officer Reyes's firearms and then,
after review of the situation, gave those guns back to Officer Reyes, a due process violation
occurs.  This would only discourage the Police Department and Prosecutor's Office from taking
the preventative safety measures that were intended by the Attorney General in creating Directive
2000-3.  Cf. Swidriski v. City of Houston, 31 Fed. Appx. 154, 2001 WL 1748238, at *1 (5th Cir.
Dec. 12, 2001) (finding that city was not liable under state created danger theory for the police
department's failure to properly conduct a background screen on firearm applicant who
ultimately killed his partner where to assign liability would discourage the department from
taking preventative measures such as background checks).

Defendants on Plaintiffs' section 1983 claims.  The Court accordingly does not reach the issue of whether Defendants are entitled to qualified immunity with respect to Plaintiffs' section 1983 claims.  See, e.g., Schieber, 320 F.3d at 423 ("because I conclude that no constitutional violation occurred, I need not reach the qualified immunity issue"); Miller, 174 F.3d at 376 n.6 ("Because we determine that Appellants' argument on appeal does not assert a valid claim of a constitutional violation, we do not reach the issue of qualified immunity.").

**B.     State Law Claims**

Defendants claim that they are entitled to immunity on Plaintiffs' pendent state law claims under New Jersey law.  Plaintiffs allege that Defendants, for the reasons discussed above, facilitated Officer Reyes's intentional homicide of Soberal, caused Soberal conscious pain and suffering, and contributed to her wrongful death.  The New Jersey Tort Claims Act (the "NJTCA") provides that "a public employee is not liable if he acts in good faith in the execution or enforcement of any law."  N.J.S.A. § 59:3-3.   The NJTCA further provides that "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable."  N.J.S.A. § 59:2-2.

The New Jersey Supreme Court has emphasized that "[t]he guiding principle of the Tort Claims Act is that 'immunity from tort liability is the general rule and liability is the exception . . . .' " Coyne v. State Dept. of Transp., 867 A.2d 1159, 1163 (N.J. 2005) (quoting Garrison v. Twp. of Middletown, 712 A.2d 1101, 1103 (N.J. 1998)).  Thus, a plaintiff must generally prove something more than ordinary negligence to overcome a state actor's immunity under New Jersey law.  See Canico v. Hurtado, 676 A.2d 1083, 1085 (N.J. 1996) ("To pierce section 3.3's qualified immunity, a plaintiff must prove more than ordinary negligence."); Dunlea

v. Twp. of Belleville, 793 A.2d 888, 890 (N.J. Super. Ct. App. Div. 2002) ("It is clear under our case law that mere negligence on the part of a public employee is generally not sufficient to defeat the good-faith immunity provided by N.J.S.A. 59:3-3.").  A court should grant summary judgment under the NJTCA section 3-3 "if public employees can establish that their acts were objectively reasonable or that they performed them with subjective good faith." Canico, 676 A.2d at 1085; see also Wildoner v. Borough of Ramsey, 744 A.2d 1146, 1153 (N.J. 2000) (indicating that the applicable standard under section 3-3 is whether the defendant's conduct was objectively reasonable).

The Court concluded above that Defendants' conduct, at most, amounted to ordinary negligence.  Plaintiffs have provided no evidence which indicates that Defendants acted with recklessness or an intent to harm Soberal in deciding to reinstate and rearm Officer Reyes. Further, for the reasons stated above, Defendants have shown that their actions were performed in good faith and were objectively reasonable.  See Tofano, 61 F. Supp. 2d at 307.  Therefore, the Court finds that Defendants are entitled to immunity from Plaintiffs' state law claims.  See Nicini, 212 F.3d at 815 (holding that district court did not err in granting summary judgment on state law claims based on immunity where at most, defendant's conduct amounted to negligence).

**V.     Conclusion**

In conclusion, the Court grants summary judgment in favor of Defendants on Plaintiffs' section 1983 claims.  The Court further finds that Defendants are immune from liability for Plaintiffs' pendent state law claims pursuant to the New Jersey Tort Claims Act, N.J.S.A. §§ 59:2-2, 59:3-3.  Since no other claims against Defendants are pending, the Court directs that they

be terminated as parties to this action.  Plaintiffs' claims against the Estate of Julio Reyes, the

City of Jersey City, the Police Department, and various employees of the Police Department as

stated in the second amended complaint remain in this matter.


Date:   July 24, 2006                                    /s/ JOEL A. PISANO
_____   United States District Judge

Original:      Clerk
cc:            Judge Arleo
               All Parties
               File