**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
ESTATE OF OMAYRA SOBERAL,                  :
Deceased; RAFAEL SOBERAL,                  :
Individually and as Administrator Ad       :
Prosequendum of the Estate of OMAYRA       :
SOBERAL;                                   :
                                           :
          Plaintiffs,                      :
                                           :
CITY OF JERSEY CITY; JERSEY CITY           :
POLICE DEPARTMENT; JAMES                   :
CARTER, Police Director; PETER             :          CIVIL ACTION NO. 04-2788 (JAP)
BEHRENS, Chief of Police;                  :
SERGEANT FRED YOUNGER; JOSEPH              :
WALSH, Police Officer; LARRY QUISH,        :          **OPINION**
Police Officer; ESTATE OF JULIO            :
REYES, Deceased; HUDSON                    :
COUNTY PROSECUTOR'S OFFICE;                :
EDWARD J. DeFAZIO, Hudson County           :
Prosecutor; JOHN DOES 1-30, Fictitious     :
Names,                                     :
                                           :
          Defendants.                      :
                                           :
                                           :
_____       :

PISANO, District Judge.

On March 3, 2003, Omayra Soberal ("Soberal") was shot and killed by Julio Reyes

("Reyes"), a Jersey City police officer.  Plaintiffs, the Estate of Omayra Soberal, Rafael Soberal,

Giovanni Alberto Germosen, and William Gonzalez (collectively, "Plaintiffs") bring this action

pursuant to 42 U.S.C. § 1983 against Defendants, City of Jersey City ("Jersey City"), Jersey City

Police Department ("Jersey City PD"), Police Director James Carter ("Director Carter"), Chief of

Police Peter Behrens ("Chief Behrens"), Lieutenant James Blake ("Lt. Blake"), Lieutenant Pat

Nalbach ("Lt. Nalbach"), Inspector Paul Wolleon ("Insp. Wolleon"), Sergeant Fred Younger

("Sgt. Younger"), and Officer John Bacigalupo ("Officer Bacigalupo") (collectively,

"Defendants"). The Defendants filed motions for summary judgment pursuant to Fed. R. Civ. P.

Rule 56. Plaintiffs oppose the Defendants' motions.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1391(b). Having

considered all arguments presented, the Court grants summary judgment as to Defendants, Jersey

City, Jersey City PD, Director Behrens, and Chief Carter, but denies summary judgment as to

Defendants, Lt. Nalbach, Insp. Wolleon, and Sgt. Younger.[1]

## I.    Procedural History

Counsel have created a protracted procedural saga by the dismissal of some parties,

substitution of others, two amended complaints, and various voluntary dismissals of claims.

Plaintiffs initially brought the instant lawsuit on June 14, 2004, alleging that the Defendants, in

their individual and official capacities, deprived Soberal of her Fifth and Fourteenth Amendment

substantive due process rights resulting from negligence (Count I), failure to train or supervise

Reyes (Count II), and failure to train or supervise the Jersey City police officers (Count III) in

violation of 42 U.S.C. § 1983; malice, willful, and wanton conduct in violation of 42 U.S.C.

§13981 (Count IV); homicide and assault (Count V); negligence (VI); and, loss of

---

[1] Lt. Blake and Officer Bacigalupo, while still named in the motion papers, appear to have been dismissed from the case. Plaintiffs made note of these dismissals in their opposition papers, *see* Pl. Opp. Brief, pg. 43 n. 13, and confirmed at oral argument on November 5, 2007, that the only officers remaining in the action were Lt. Nalbach, Sgt. Younger, and Insp. Wolleon. Tr. pg. 2:24-3:6.

companionship (Count VII).  Plaintiffs sought compensatory and punitive damages pursuant to

42 U.S.C. §§ 1983 and 13981, and sought attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

On August 5, 2005, Plaintiffs filed an amended complaint naming additional Plaintiffs,

William Gonzalez and Giovanni Alberto Germosen.  Plaintiffs also added Defendants, Lt. Blake,

Lt. Nalbach, Insp. Wolleon, Sergeant William Cullinane ("Sgt. Cullinane"), Detective Kevin Guy

("Det. Guy"), Officer Charles Levine ("Officer Levine"), Officer Bacigalupo, Officer Michael

Gullace ("Officer Gullace"), Peter Stoma, Assistant Hudson County Prosecutor ("Stoma"), John

Does 1-25, and Jane Does 1-5.

A second amended complaint was filed on November 21, 2005.  Plaintiffs allege that the

Defendants, in their individual and official capacities, deprived Soberal of her Fifth and

Fourteenth Amendment substantive due process rights (Count I), failure to properly train and

supervise Reyes (Count II), failure to properly train and supervise the Jersey City police officers

(Count III), and negligence (Count IV) in violation of § 1983; facilitated Reyes' intentional

homicide of Soberal (Count V); caused Soberal conscious pain and suffering (Count VI); and,

contributed to Soberal's wrongful death (Count VII). [2]  Plaintiffs seek compensatory and punitive

damages pursuant only to § 1983 and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

On November 30, 2005, Defendants, DeFazio, Stoma, and the HCPO filed a motion to

dismiss for lack of jurisdiction.  Plaintiffs opposed the motion.

On May 22, 2006, Plaintiffs dismissed various claims asserted in the second amended

complaint.  Count III as to Defendants, DeFazio and Stoma was dismissed.  Plaintiffs also

---

[2]  Plaintiffs bring Count I solely against the City of Jersey City, Jersey City Police Department,
and the named employees of the Jersey City Police Department.

dismissed Defendants, DeFazio, Stoma, John Does 1-25, and Jane Does 1-5 acting as agents, employees, or servants of the HCPO, in their official capacity only.

On July 24, 2006, the Court granted Defendants, DeFazio, Stoma, and the HCPO's motion to dismiss for lack of jurisdiction and terminated those Defendants as parties from the action.

On December 26, 2006, the parties executed a consent order dismissing Defendants, Officer Joseph Walsh ("Officer Walsh"), Officer Larry Quish ("Officer Quish"), Det. Guy, Officer Levine, Sgt. Cullinane, and Officer Gullace.

The Defendants, Sgt. Younger, Lt. Nalbach, and Insp. Wolleen (collectively, "Defendant officers") filed the instant motion for summary judgment on March 29, 2007.  The Defendants, Jersey City, Jersey City PD, Director Carter, and Chief Behrens (collectively, "Defendant municipality") filed their motion for summary judgment on March 30, 2007.  In their opposition, Plaintiffs consented to the entry of summary judgment in favor of the Jersey City PD as to all counts, dismissed the claims against Director Behrens and Chief Carter, individually, and limited punitive damages as to the individual defendants only.

The claims which remain are: municipal liability against Jersey City and Defendants, Director Carter and Chief Behrens under § 1983; violations of Soberal's Fifth and Fourteenth Amendment substantive due process rights against Lt. Nalbach, Sgt. Younger, and Insp. Wolleen under § 1983; and, pendent state law torts claims against all of the Defendants.  The Court heard oral argument on November 5, 2007, and now decides the motion.

II.     **<u>Facts of the Case</u>**

The facts of this case are undeniably tragic.  Soberal and Reyes began a romantic relationship in October 2002, and eventually lived together with Soberal's two sons, Giovanni Germosen and William Gonzalez.  On August 24, 2002, an alleged domestic violence dispute occurred between Reyes and Soberal at their house.  As described in the police report, an argument between the two escalated into physical contact where Soberal allegedly pushed Reyes and, according to Soberal, Reyes slapped her, which he denied.  Ultimately, neither party filed a formal complaint nor were there any criminal charges brought against them.

At the time of the incident, the responding Jersey City police officer, Sergeant Reynolds ("Sgt. Reynolds"), was informed by Soberal that Reyes was also a Jersey City police officer, which Reyes confirmed.  Reyes had been a member of the Jersey City PD since March 9, 1994 and was stationed out of the West District.  The Jersey City PD had a policy, General Order #11-96 ("Order 11-96"), that required police officers responding to domestic violence calls involving another police officer to assess the scene and determine whether a seizure of weapons was warranted.  Sgt. Reynolds did not observe any objective, physical signs of violence in the apartment, and because Reyes' weapons were already secured at the West District, Sgt. Reynolds determined that a seizure of Reyes' weapons was not necessary.  Soberal and Reyes were each given a victim's rights sheet.

After this first incident, Soberal and Reyes continued to cohabit together.  On October 16, 2002, Soberal called emergency services to respond to their apartment because Reyes was harassing her in an attempt to reconcile, which she did not want to do.  Sgt. Reynolds, again, responded to the call.  Soberal's allegations against Reyes were not physically violent in nature and Sgt. Reynolds did not observe any signs of physical injury or property damage.  Soberal did

not want to file a formal criminal complaint against Reyes.  Sgt. Reynolds ordered Reyes to report to the West District while he escorted Soberal to the South District to complete the application for a temporary restraining order ("TRO").  At the South District, Soberal spoke with a municipal court judge via telephone, and after the interview was completed, the municipal judge issued a TRO with weapons restriction.  The TRO was served upon Soberal and Reyes, whose weapons were also confiscated.  Reyes was suspended from duty pursuant to N.J.A.C. 4A:2-2.3.

On October 25, 2002, the return date for entry of a Final Restraining Order ("FRO"), Soberal and Reyes appeared before the Honorable Hector Vasquez in the Superior Court of New Jersey, Chancery Division, Family Part.  Soberal opted to forgo seeking a FRO and consented to the dismissal of the action.  Soberal also executed an Affidavit for Dissolution/Modification of Order in which she requested the dissolution of the TRO.  The affidavit acknowledged that Soberal's request was voluntary and that she had reconsidered her request.  The court entered an Order of Dismissal.

Because Reyes was an officer involved in domestic violence, the Jersey City PD Internal Affairs Unit ("JCPD-IAU") became involved in the investigation.  The JCPD-IAU is responsible for determining whether to recommend to the County Prosecutor the return of a weapon to a police officer.  Lt. Blake of the JCPD-IAU interviewed Soberal to determine whether she had any concerns about the return of Reyes' weapons, which Soberal consented to on October 29, 2002. On October 30, 2002, Lieutenant Donahue forwarded a request to Stoma that Reyes should have his weapons returned so he could return to duty.

Reyes was also scheduled for a fitness for duty psychological examination at the Institute

for Forensic Psychology on November 5, 2002.  Reyes was examined by Amie Wolf-Mehlman,

Ph.D.  Dr. Wolf-Mehlman's report concluded that:

(1)     Officer Reyes is basically fit for duty.  He demonstrates no mental disorders or
        significant clinical symptoms at this time, although there are problems with stress
        with regard to relationships.

(2)     Officer Reyes is experiencing some anxiety and would certainly benefit from, and
        should be required to attend therapy sessions and stress management sessions in
        order to stabilize himself with regard to his anxiety and relationship difficulties.

(3)     Officer Reyes is not considered a danger to self or others at this time.

(4)     Officer Reyes should continue in counseling, as well as stress management, for at
        least three to six months.  He should have his treating professional send regular
        reports to his department signifying that:  (a) he is coming to sessions; (b) that he
        is, or is not serious about treatment; (c) that he is, or is not making progress; and
        (d) whether or not any changes have occurred which would constitute danger to
        self or others.

(5)     Officer Reyes should not terminate treatment until it is mutually agreed upon
        between himself and the treating physician.

(6)     On conclusion of treatment, Officer Reyes should submit a letter from his treating
        physician certifying that he is fit to return to full duty.

(7)     It would be very important to consider removing this individual's weapons and
        consider him unfit for duty if, in the future, there is any evidence of any problems
        between himself and others that involve anger or aggression.

Def. Ex. R.  Dr. Wolf-Mehlman did not recommend that Reyes complete his counseling before

returning to duty.

Following Dr. Wolf-Mehlman's findings, Sergeant Alexander Forsythe ("Sgt. Forsythe")

of the JCPD-IAU investigated the charges against Reyes and "sustained" them.  He noted the

"murkiness" of Dr. Wolf-Mehlman's findings and "the many caveats she included" regarding

Reyes' return to duty.  Def. Ex. S., pg. 000141.  Sgt. Forsythe also recommended Reyes could be

given his weapon back upon approval by HCPO, which Stoma granted on December 3, 2002, conditioned upon Reyes obtaining psychiatric counseling as suggested by Dr. Wolf-Mehlman.

Reyes was then referred to the Jersey City Employee Assistance Program ("JCEAP") for an initial evaluation and referral to counseling. On December 4, 2002, Lila White of the JCEAP advised the Jersey City PD that, based on Reyes' evaluation, he would receive three months of weekly counseling - the equivalent of twelve weeks or twelve sessions - from Tod Bergman ("Bergman"), a licensed clinical social worker, beginning December 11, 2002. Reyes attended his regular sessions with the therapist and Bergman reported to the Jersey City PD that Reyes was in compliance with his required counseling and was making progress. Reyes' final session with Bergman was scheduled for March 5, 2003.

During the course of his treatment, Reyes continued a relationship with Soberal. Reyes' divorce from his first wife, Nilsa Reyes, was also finalized during the week of February 16, 2003. In the week leading up to the tragic events of March 3, 2003, Reyes left several messages on Soberal's voice mail at work, which were discovered during a post-incident investigation conducted by Hudson County detectives. The post-incident investigation also revealed what appeared to be a suicide note written by Reyes, although it is unclear when or how Soberal received the note. On or about March 1, 2003, Reyes learned that Soberal had been dating an old boyfriend during his relationship with her and started harassing her. According to Soberal's brother, Raphael Soberal, Soberal intended to file a restraining order against Reyes on March 2, 2003. Soberal called the South District, but did not go to the police station that night.

The following day, on March 3, 2003, Soberal went to the West District on her way home from work and asked to speak with Reyes' supervisor. Lt. Nalbach was brought to speak with

Soberal, and she informed him that she was having problems with Reyes, Reyes was making

harassing phone calls to her, and she wanted a restraining order against Reyes.  Lt. Nalbach then

called the Jersey City PD Central Control Room looking for the Commander in Charge, who was

Insp. Wolleen that evening.  At some point, Soberal left a message on Reyes' beeper at 6:00

p.m., which he retrieved at 6:05 p.m.  Insp. Wolleen, who was not at the station, was contacted

by Lt. Nalbach and told about Soberal's complaints against Reyes.  Pursuant to procedure,

around 7:30 p.m., Insp. Wolleen contacted Lt. Blake of the JCPD-IAU and when the two spoke,

Lt. Blake asked to be kept informed about the situation, and if a restraining order were to be

issued, Insp. Wolleen was to bring Reyes into the JCPD-IAU.

When Insp. Wolleen arrived at the West District, he found Lt. Nalbach with Soberal.

After speaking with Soberal, Insp. Wolleen instructed Sgt. Younger to interview Soberal and

process her application for a TRO.  Reyes was not present at the time.  Sgt. Younger escorted

Soberal to an office on the second floor of the building and began his interview of Soberal.

While the interview was being conducted, Reyes called the West District at approximately 7:40

p.m.  At the time of the call, Officer Bacigalupo was at the Sergeant's desk and asked to answer

it.  The following thirty-second conversation took place:

> **Bacigalupo:** "West District, Officer Bacigalupo."
> **Reyes:** Pachuki? Petrovich?[3]
> **B:** No, Bacigalupo.
> **R:** Hey Bac, it's Julio Reyes, is the maniac one there for me?"[4]
> **B:** Uh, yeah.

---

[3] Pachuki and Petrovic were both Jersey City police officers at the time of this incident.

[4] The JCPD transcript of the phone conversation indicates that Reyes asked, "Is the maniac one there for me?"  Officer Bacigalupo testified, however, that upon hearing the audio tape of the call, the tape reflects that Reyes asked whether there was "someone" there for him.

> **R:** What does she want?
> **B:** Don't know, she's upstairs.
> **R:** Upstairs?
> **B:** Yeah, uh.  I don't really want to talk on this phone, you know
>     what I mean?
> **R:** Alright, alright.
> **B:** Umm.
> **R:** Alright, I'll be in.
> **B:** The only thing...you want to swing by?
> **R:** Yeah, I'm gonna swing by.
> **B:** Okay.
> **R:** Alright, bye.

Def. Ex. GG, pg. 000259.  Sgt. Younger continued to conduct his interview of Soberal to obtain

the factual basis for the TRO.  Soberal declined to file criminal charges against Reyes and

advised Sgt. Younger that there had been a previous TRO, but that she voluntarily dismissed it.

Soberal did not tell Sgt. Younger about any other incidents prior to the October 2002 TRO or that

she intended to file a TRO the night of March 2, 2002.  She also did not tell Sgt. Younger about

Reyes' suicide note that the investigators later found.

　　　While the interview was being conducted, Reyes arrived at the West District, entered the

interview room, and attempted to speak with Soberal.  Sgt. Younger ordered Reyes to go

downstairs and called Lt. Nalbach around 7:45 p.m. to tell him about what happened.  While on

hold, Sgt. Younger continued to interview Soberal, which was recorded:

> **Officer Gullace:** "West District, Officer Gullace."
> **Sgt. Younger:** Hey, how you doing?  Is the Lt. around, it's Freddy
>     Younger.
> **OG:** Yeah, he's on the other phone, you want to just hold on a
>     sec, Freddy?
> **SY:** Yeah, thanks. [To Soberal] Same exact complaint, right?  Right.
>     So basically he's harassing you by calling you at all different
>     hours of the day and night leaving messages on your voice mail
>     looking to reunite.  Is there anything.  Basically we need to see
>     how much room do we have here.  Between, I'm not trying to

-10-

> break your complaint down or anything, but we need to have a
> few sentences.

Def. Ex. GG., pg. 000259-60.  Sgt. Younger was disconnected while still on hold for Lt.

Nalbach.  Sgt. Younger then called Lt. Nalbach again around 7:47 p.m. and advised him that he

sent Reyes downstairs and to keep Reyes away from Soberal:

> **OG:** "West District, Office Gullace."
> **SY:** It's Fred Younger, we got cut off.
> **OG:** Okay, yeah — It's Fred Younger.
> **Lt. Nalbach:** Yeah, Fred?
> **FY:** Hey Lt., I'm upstairs with the victim of that domestic violence
>   situation.
> **LN:** Mmm hmm.
> **FY:** You're aware or it, or?
> **LN:** Yeah, I got most of it.
> **FY:** All right, I sent Julio down to stay by the desk.
> **LN:** Yeah, he's sitting by the cage, I think.
> **FY:** Okay, I told him to stay downstairs.
> **LN:** Yeah, cause I said I — never mind — go ahead.
> **FY:** I'm gonna be doing the reports and taking out a restraining
>   order.  But I just wanted him to stay downstairs. I didn't
>   want any contact.
> **LN:** Yeah, I told him.  Okay, I said that.  Somebody must have
>   told him they thought they saw her in here for some reason.
> **FY:** Yeah, all right.
> **LN:** All right.

*Id.*  The interview continued for another forty-five minutes, during which time Soberal played for

Sgt. Younger, at 7:48 p.m. and 7:51 p.m., two voice mails Reyes left her.

During one point in the interview, Insp. Wolleen went upstairs to speak with Sgt.

Younger.  On his way up to the room, Insp. Wolleen saw Reyes in the report area, which is also

known as the area around the "cage."  Reyes told Insp. Wolleen, "this is not what you think."

Def. Ex. HH, pg. 38:20.  It is unclear whether Insp. Wolleen ordered Reyes and his partner,

Officer Levine, to leave the West District, but he did not see them when he came back

downstairs.[5]

Meanwhile, Sgt. Younger contacted the Jersey City PD Bureau of Criminal Investigations to determine which municipal judge was on-duty to take Soberal's application for a TRO, which was Judge Rosen, and Sgt. Younger then beeped the judge.  At approximately 8:30 p.m., Judge Rosen called the West District and interviewed Soberal for about fifteen minutes.  Judge Rosen then spoke with Sgt. Younger and admitted that he preferred not to issue restraining orders against police officers because they would be suspended.  Judge Rosen asked Sgt. Younger if he would vouch for Reyes' character, so as to avoid the issuance of a restraining order.  Sgt. Younger declined to vouch for Reyes.  Judge Rosen issued the TRO with a confiscation of Reyes' weapons.  Sgt. Younger notified Insp. Wolleon and Lt. Nalbach that the TRO had been issued and Soberal was given a copy of the TRO around 9:00 p.m.

At approximately 9:05 p.m., Lt. Nalbach advised the West District that he "just put West PC on administrative at the West."  Def. Ex. GG, pg. 000261.  "West PC" stands for "West District Plain Clothes," meaning a non-uniformed officer, which was the detail Reyes was assigned.  Insp. Wolleon asked Det. Guy to inquire about whether Soberal needed to be driven home or have a police escort home, which is standard police procedure for TRO recipients.  At approximately 9:08 p.m., while Sgt. Younger escorted Soberal downstairs to the Sergeant's desk,

---

[5] Insp. Wolleon claims he saw Reyes and his partner walk out the front door.  Def. Ex. HH, pg. 39:18-40:3.  Officer Levine, however, denies leaving the building.  Pl. Ex. 3.  Additionally, between 8:10 and 9:00 p.m., Nilsa Reyes, spoke with Reyes several times and Reyes told her he was at the West District as Soberal was in the process of obtaining a TRO against him.  Pl. Ex.2, 108-112,116:2-4.  Furthermore, although the patrol log entries indicate that Reyes and Officer Levine responded to a burglary at 8:49 p.m., *see* Pl. Ex. 17, a dispatcher communicated by radio with Reyes and Officer Levine at 8:06 p.m., 8:07 p.m., 8:15 p.m., and 8:31 p.m.  Reyes and Officer Levin responded to these calls from the West District.  Pl. Ex. 21.

he noticed Reyes coming up the stairs from the basement locker room.  Sgt. Younger instructed Reyes to remain where he was and Reyes complied.  When they reached the Sergeant's desk, Sgt. Younger asked Sgt. Cullinane to arrange a ride home for Soberal and Sgt. Cullinane, in turn, ordered Officers Quish and Walsh to drive Soberal home.

After Soberal and the two police escorts left the building, Sgt. Younger attempted to serve the TRO on Reyes and seize his weapons.  Reyes started heading for the front door of the West District.  Sgt. Younger yelled at Reyes to stop, but Reyes disregarded his order and kept running.  Reyes' weapon was not drawn.  While this was occurring inside the West District, Officer Walsh and Officer Quish escorted Soberal to their patrol car and placed her in the back seat.  The back doors locked from the inside and could only be opened from the outside.  Officer Quish was in the front passenger seat and Officer Walsh was in the driver seat.  Officer Walsh turned towards the back seat and asked Soberal for her address while Officer Quish was looking forward.  Soberal gave Officer Walsh her address and when he turned to start the vehicle, at approximately 9:17 p.m., he observed Reyes in the rear view mirror, running past the back of the vehicle.  Officer Walsh yelled to Officer Quish to alert him of the situation, but within a second, Reyes had opened the rear passenger door and discharged his weapon five times striking Soberal.  Simultaneously, both officers exited the vehicle and Officer Quish lunged towards Reyes.  Reyes, however, had the weapon at the side of his head and discharged a single gun shot, killing himself instantly.

Sgt. Younger and Sgt. Cullinane had just reached the door entrance to the West District when they heard the shots fired.  Firemen who heard the shots from the Fire Station next door rushed over to the scene to administer medical assistance to Soberal.  Det. Guy, a certified

paramedic, was upstairs when he heard the gun shots and ran down to attend to Soberal.  Sgt. Younger ordered Sgt. Cullinane, Officer Walsh, and Officer Quish back inside.  An ambulance was called to respond to the scene.  Soberal was unconscious and when the ambulance arrived, it took her to the Jersey City Medical Center where she remained unconscious for the next six days.  On March 9, 2003, Soberal was removed from life support and passed away shortly thereafter.

## III.   <u>Standard of Review</u>

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial.  *Id.* at 324.  In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable

to the non-moving party.  *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.   <u>Discussion</u>

Section 1983, Title 42 of the United States Code, in pertinent part, states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Because § 1983 does not create any substantive rights but, rather, a remedy for a deprivation of rights established by the Constitution or other federal laws, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law" in order to establish a § 1983 claim.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1204 (3d Cir. 1995). Plaintiffs allege that Soberal's substantive Fifth and Fourteenth Amendment due process rights were violated and, as such, the Defendants are liable under § 1983.

a.      *Municipal Liability*[6]

A municipality cannot be held liable under § 1983 based on a theory of *respondeat superior*; however, a municipality can be sued directly under § 1983 if the action that caused a constitutional tort was based on a municipal custom or policy.  *See Monell v. Dept. of Soc. Services of the City of New York*, 436 U.S. 658 (1978); *see also Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994).  "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.

The burden falls on the plaintiff to produce evidence of a specific policy or custom established by the entity or its official that violated the plaintiff's constitutional rights.  *See Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970) ("a [§ 1983] civil rights complaint must portray specific conduct by state officials which violates some constitutional right of the complainant in order to state a claim for relief").  A "policy" is made when a "statement, ordinance, regulation, or decision" is "officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.   A "custom" is "a given course of conduct, although not specifically endorsed or authorized by law...so well-settled and permanent as virtually to constitute law."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  Policy or custom cannot be inferred from a single, isolated municipal act.  *See Fletcher v. O'Donnell*, 867 F.2d

---

[6] Plaintiffs concede in their opposition brief to the motions for summary judgment that they cannot establish municipal liability under § 1983 for failure to train its officers.

791, 793 (3d Cir. 1989) ("A single incident by a lower level employee acting under color of law, however, does not suffice to establish either an official policy or custom."), *cert. denied*, 492 U.S. 919 (1989).  Only when the custom can be established by other means such as "proof of knowledge and acquiescence" will a single incident of custom be sufficient to establish it was done pursuant to official policy.  *Id.*

Municipal liability will only attach "where the decisionmaker possesses final authority to establish the municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  As the Supreme Court explained:

> "The fact that a particular official - even a policymaking official -
> has discretion in the exercise of particular functions does not,
> without more, give rise to municipal liability based on an exercise
> of that discretion...municipal liability under § 1983 attaches
> where - and only where - a deliberate choice to follow a course
> of action is made from among various alternatives by the
> official or officials responsible for establishing final policy
> with respect to the subject matter in question."

*Id.* at 482-83; *see also Bielevicz*, 915 F.2d at 850 (stating that a plaintiff "must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

Once a plaintiff demonstrates a policy or custom exists, a plaintiff must then establish a nexus between the policy or custom and the constitutional violation that occurred.  The policy or custom must be the "moving force of the constitutional violation."  *Monell*, 436 U.S. at 694; *see also Bielevicz*, 915 F.2d at 850 ("To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue.").

-17-

Plaintiffs, here, have failed to set forth the specific policy or custom established by the Defendant municipality, which violated Soberal's constitutional rights.  Plaintiffs attempt to establish liability by citing Order 11-96, which did not require responding officers to seize the weapons of a police officer involved in a domestic violence situation.  It states: "The seizure of weapons from law enforcement officers involved in domestic violence situations, whether the officer is the accused batterer or victim, is not routine and required in all cases...a decision to seize weapons requires an evaluation of risk present in each case." Def. Ex. E.  Although Order 11-96 may be considered a police policy, it is not a policy that deprived Soberal of a constitutional right.  On the contrary, the Jersey City PD acted with more caution than was required by Order 11-96.  The TRO that was issued to Soberal on March 3, 2003, also included a seizure of Reyes' weapons.  The Jersey City PD was not obligated under Order 11-96 to relieve Reyes of his weapons, but it realized the necessity of confiscating Reyes' weapons based on the circumstances.  The Court simply does not find any nexus between the municipality's Order 11-96 and Soberal's ultimate injury.[7]  *See Ehly v. City of Philadelphia*, Civ. No. 03-3634, 2004 U.S. Dist. LEXIS 23493 , at *10 (E.D.P.A. Nov. 17, 2004) ("No reasonable jury could find that the City of Philadelphia's lenient policies regarding police discipline were the 'moving force' that directly caused [the officers] allegedly unconstitutional conduct.").

Moreover, merely highlighting actions conducted by Insp. Wolleon as "chief-in-charge" on the night of March 3, 2003 is not enough to establish that he was following a municipal policy

---

[7] Plaintiffs attempt to show that Order 11-96 resulted in a constitutional deprivation of Soberal's rights by pointing to a change in policy after Soberal's death.  A change in policy, however, is not an admission of prior negligence on the part of the municipality.  It is well-settled public policy that municipalities, corporations, or other entities be allowed to revise and reform their policies without fear of liability in order to make safer policies.

or custom.  Further, any actions Insp. Wolleon undertook are not supported by any evidence that

Insp. Wolleon had policy-making authority.  The Court, therefore, grants summary judgment in

favor of the Defendants, Jersey City, Director Carter, and Chief Behrens on the issue of

municipal liability.

       *b.*      *State-Created Danger vs. Individual Officers*

The Fourteenth Amendment does not require a state to guarantee a minimum level of

safety and protection for its citizens.  "Nothing in the language of the Due Process Clause itself

requires the State to protect the life, liberty, and property of its citizens against invasion by

private actors.  The Clause is phrased as a limitation on the State's power to act, not as a

guarantee of certain minimal levels of safety and security."  *DeShaney v. Winnebago County*

*Dept. of Soc. Services*, 489 U.S. 189, 195 (1989).  The Due Process Clause was meant to "protect

the people from the State, and not to ensure the State protected them from each other."  *Id.* at

196.

While there is no affirmative duty on a State to protect its citizens from private actions,

the Supreme Court has noted two exceptions when a duty does arise.  First, a special relationship

is created if the State takes a person into custody.  There is an assumption of a level of

responsibility for the person's well-being.  *See DeShaney*, 489 U.S. at 199-200 ("when the State

takes a person into custody and holds him there against his will, the Constitution imposes upon it

a corresponding duty to assume some responsibility for his safety and general well-being").

Second, if the State affirmatively places an individual in more danger than the person otherwise

would have been if the State did not intervene, a substantive due process violation arises.  This

exception has become known as the "state-created danger" theory.  *See id.* at 201. (acknowledging that although a State cannot be liable for failing to protect an individual from private acts of violence, liability is not precluded where a private act of violence occurs as a product of a State's affirmative conduct).

Although the Supreme Court found that neither of these exceptions applied in *DeShaney*, other courts have applied the *DeShaney* reasoning to determine whether a substantive due process rights violation occurred based on a "state-created danger" theory.  *See id.* (explaining that the State "played no part" in the creation of the dangers the plaintiff faced and did not "do anything to render [plaintiff] more vulnerable to [the dangers]").  *Compare with Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) (finding that the State engaged in affirmative conduct that left the plaintiff in a more dangerous situation than had they not intervened.  The plaintiff and her husband were walking home from a bar when stopped by officers.  The officers let the plaintiff's husband continue home, but kept the plaintiff, who was inebriated, behind.  The officers then let the plaintiff walk home without an escort, wherein the plaintiff fell and suffered injuries).

In *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir. 1995), the Third Circuit adopted a four-part test to determine liability under a "state-created danger" theory.  In order to establish liability, a plaintiff must prove: 1) that the harm ultimately caused to the plaintiff was foreseeable and direct; 2) the state actor acted in willful disregard for the plaintiff's safety; 3) there was some relationship between the state and the plaintiff; and, 4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed.  *Mark*, 51 F.3d at 1152.

      i.    <u>*Foreseeable and Direct Harm*</u>

A reasonable trier of fact could conclude that the harm to Soberal caused by the individual officers was foreseeable and direct.  Prior to the March 3, 2003 TRO, there were two other instances of domestic violence, which Jersey City officers responded to and where one of those instances led to a TRO with weapons confiscation issued against Reyes.  On March 3, 2003, the Defendant officers knew of Reyes' presence in the West District and that he attempted to talk with Soberal while she was being interviewed by Sgt. Younger.  At the minimum, the officers knew that Reyes wanted contact with Soberal.  Furthermore, although the Defendants claim that they did not know Soberal feared for her safety because she only mentioned that Reyes was harassing her with phone calls, a reasonable jury could infer that Soberal was fearful of physical violence because she requested for a confiscation of Reyes' weapons in the March 3, 2003 TRO, which was granted.

Therefore, the Court determines that a reasonable jury could find that given Reyes and Soberal's past TRO with weapons confiscation, as well as his presence in the West District on the night of March 3, 2003 and the issuance of the March 3, 2003 TRO with weapons confiscation, that the harm to Soberal was foreseeable and direct.[8]

ii.    _Willful Disregard for Soberal's Safety_

---

[8] Plaintiffs proffer evidence that Soberal was wearing a bulletproof vest at the time of her death to support their assertion that the harm to Soberal was foreseeable and direct.  Plaintiffs argue that the existence of the vest presents an issue of material fact.  Nevertheless, the Court will not consider this evidence because of hearsay issues.  Plaintiffs' only support for the evidence is an investigator's report attributable to a medical examiner who apparently noted the bulletproof vest based on information from a Nurse Melvin.  There is no contemporaneous support of the vest's existence - no police report or recollection of any witness.  Furthermore, discovery has not corroborated the evidence.  Nurse Melvin has not been deposed or the observation confirmed, and the bulletproof vest itself has not been recovered or produced.  Thus, the investigator's report is inadmissible hearsay.  The Court determines that, in terms of a summary judgment analysis, the vest does not present a "genuine issue" of fact because it not fairly debatable and, therefore, will not be considered.

To establish the second prong of the "state-created danger" theory, a plaintiff must prove that the state actor acted with a degree of wrongfulness that "shocks the conscience." *Bright v. Westmoreland*, 443 F.3d 276, 281 (3d Cir. 1995). In determining whether an action "shocks the conscience," a court must consider the circumstances surrounding the action. The more pressurized an environment or situation the state actor must make his decision in, the higher the degree of culpability the plaintiff must show that the state actor had. *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.) ("The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case...a much higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider the risks."). "Negligence is not enough to shock the conscience under any circumstances...more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under pressure." *Schieber v. City of Philadelphia*, 320 F.3d 409, 419 (3d Cir. 2003).

If the state actor has time to take into account all of the factors that need to be considered, such as when prison doctors are evaluating the medical needs of the prisoners, culpability need only rise to deliberate indifference. *See County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) ("[deliberate indifference] standard is sensibly employed only when deliberation is practical...and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare"). The more time the actor has to consider the consequences of his actions, the lower the standard for culpability. *Miller*, 174 F.3d at 375. Deliberate indifference, therefore, does not rise to the level of "shocking the conscience" in situations where

the state actor must respond quickly with little time to process the circumstances.  In those

situations, such as a high-speed car chase or prison riot, liability will only attach if there was a

"purpose to cause harm." *Id.* (quoting *Lewis*, 523 U.S. at 853).  For situations, however, that fall

in the middle of this spectrum - where the state actor is not pressured, but does not have time to

act deliberately or where competing interests must be balanced within a short period of time -

liability only attaches if the state actor "consciously disregarded, not just a substantial risk, but a

great risk that serious harm would result." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d

Cir. 2002).

In evaluating the course of actions to undertaken in handling Soberal's TRO and Reyes'

presence in the West District, the Defendant officers were not acting in a highly pressurized

situation.  Unlike situations involving police riots or high speed car chases, the Defendant

officers had ample opportunity to consider their actions.  Soberal arrived at the West District

when she arrived home from work where she remained over the course of several hours, enabling

the officers to think and act deliberately.

The Court finds that there are several incidents a reasonable trier of fact could determine

that the Defendant officers acted with deliberate indifference.  Even if the Court were to consider

that the Defendant officers were working in a situation where they did not have time to conduct a

full deliberation of the circumstances, a reasonable jury could find that the officers consciously

disregarded a great risk that harm would result to Soberal.  For instance, in the taped

conversation of Lt. Nalbach's phone call with Insp. Wolleon concerning Soberal's visit to the

West District, Lt. Nalbach appears to minimize the seriousness of Soberal's request for a TRO by

suggesting that the officers not contact the JCPD-IAU.

> **Lt. Nalbach:** "She wanted a restraining order — another one done up."
>
> **Insp. Wolleon:** Yeah.
>
> **LN:** And she wanted it done tonight.
>
> **IW:** Well, you know we gotta do it.
>
> **LN:** No, I'm not saying that — he's working tonight but I'm just trying to do this as harassment and a restraining order, and you know the reports.
>
> **IW:** Well, you know what?  I'm gonna have them reach out for Blake.
>
> **LN:** Cause I don't know if you want [JCPD-IAU] involved, that's what I'm saying.
>
> **IW:** Well, [JCPD-IAU] usually want to get involved on the ground floor.
>
> * * *
>
> **LN:** Yeah, I asked her — Were you involved with Internal Affairs at all — she said the last time they called her all the time on it.
>
> **IW:** Well, I think I'm gonna give [JCPD-IAU] a call, I'm just gonna have them reach out for Blake.
>
> **LN:** Okay.

Def. Ex. GG, pg. 000257.  A reasonable jury could find that Lt. Nalbach initially exhibited deliberate indifference to Soberal's complaint against Reyes.  The officers were not in any pressurized situation when they conversed on the phone.  Lt. Nalbach appeared to want to avoid involving the JCPD-IAU involved and seemed to be providing Insp. Wolleon with other options in how to deal with the restraining order by mentioning that Reyes was working that night.  It was only after Wolleon highlighted the "gravity" of the prior domestic violence incident that Lt. Nalbach agreed the JCPD-IAU would need to be involved.

A reasonable trier of fact could also find the Defendant officers acted in a way that "shocks the conscience" in the actions they undertook after Soberal's TRO was processed and served upon her.  The Defendant officers were aware that Soberal was at the West District to have a TRO issued against Reyes.  The Defendant officers were also aware that Reyes came to

-24-

the West District and attempted to have contact with Soberal by interrupting her interview with Sgt. Younger.  Sgt. Younger sent Reyes down to the first floor, away from Soberal, but did not have any idea about Reyes' specific whereabouts within the station.  Even after Sgt. Younger informed Lt. Nalbach over the phone that Reyes disrupted the interview and he sent Reyes downstairs, it appears that neither officer was certain of Reyes' location.  Lt. Nalbach informed Sgt. Younger only that he thought Reyes was "sitting by the cage."  Def. Ex. GG, pg. 000260. The Defendant officers left Reyes unsupervised in the station.  Even after the TRO was issued, the Defendant officers failed to have Reyes under supervision.  Chief Carter admitted in his deposition that he would have expected his officers to verify Reyes' whereabouts in the station and relieved of his weapon or, at the very least, have him detained somewhere so he could not harm anyone.  Pl. Ex. 16, 59:19-60:25.

Moreover, Sgt. Younger admitted that he delayed serving the TRO upon Reyes and relieving him of his weapons because he wanted to do so in private so as to not embarrass Reyes in front of the other officers.  Pl. Ex. 5, 105:20-106:7.  A reasonable jury could find this "shocks the conscience."  The man Soberal sought a TRO for was in the same vicinity as Soberal.  The TRO was not served upon Reyes before walking Soberal past him.  Reyes still maintained control of his weapon.  The Defendant officers had plenty of time to consider these actions.  It appears to the Court that preserving Reyes' pride weighed more heavily than protecting the holder of a TRO, which a reasonable jury could view as deliberate indifference for Soberal's safety.[9]

---

[9] The Court is inclined to view the Defendant officers' actions as being likely influenced by the fact that Reyes was a fellow officer; had Reyes been a civilian, the Defendants would have exhibited more caution in how they handled the processing and serving of Soberal's TRO.  It is unlikely that the Defendant officers would have allowed a civilian to come into the station, interrupt a processing interview, and remain there unsupervised.  A civilian would have been served with the TRO immediately

A reasonable jury could conclude that the Defendant officers knew that Reyes and Soberal should be kept separated, and exhibited deliberate indifference for Soberal's safety by leaving the subject of a TRO unsupervised and armed while the TRO applicant was in the same building.

### iii.  <u>Relationship Between Soberal and the Officers</u>

A relationship between a victim and the state actor can be said to have existed if "'the plaintiff was a foreseeable victim of the defendant's acts' or a 'member of a discrete class of persons subjected to the potential harm brought about by the state's actions.'" *Bright*, 443 F.3d at 281 (quoting *Kneipp*, 95 F.3d at 1209 n.22; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906-913 (3d Cir. 1997)).  "The relationship requirement under the state-created danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense." *Kneipp*, 95 F.3d at 1209 n. 22.

A reasonable jury could find that a relationship existed between Soberal and the Defendant officers, which placed Soberal in danger of a foreseeable injury.  Sgt. Younger interviewed Soberal for her TRO application.  He spoke with the municipal judge to get the TRO issued and served Soberal with the TRO, which also contained a seizure of Reyes' weapons.  The Defendant officers knew Reyes was at the station trying to get in contact with Soberal to talk with her.  They knew that Soberal was being harassed by him, which led her to seek the TRO. Despite knowing all of this information, Sgt. Younger then escorted Soberal down from the

---

after it was issued; however, Reyes was not.  It appears that because Reyes was a fellow police officer, the Defendants were more inclined to give Reyes leeway and be mindful of Reyes' reputation.

second floor to the first floor in close proximity to where Reyes was standing.

Furthermore, according to a tape transcript of a conversation between Lt. Nalbach and Insp. Wolleen when Soberal first arrived at the West District on March 3, 2003, those officers knew about the prior domestic dispute issue and that Soberal was afraid something would happen that night.

> **Lt. Nalbach:** "Cause I was saying we could do whatever you want.
> He's working tonight, too."
> **Insp. Wolleen:** Who's that, Blake?
> **LN:** No, Reyes.
> **IW:** Reyes?  Well, given the gravity of the last one and how
> involved...
> * * *
> **LN:** Yeah she said she's afraid something might happen so she
> wants the Restraining Order tonight.  But so far it's just
> harassment.

Def. Ex. GG, pg. 000257-58.  A reasonable trier of fact could interpret Insp. Wolleen's remark about "the gravity of the last one" as evidence that the officers knew about the seriousness of the situation between Reyes and Soberal, and that Soberal feared for her safety, which is why she asked to have Reyes' weapons confiscated.  The Court finds there are genuine issues of material fact and believes that a reasonable jury could determine that a relationship existed between Soberal and the Defendant officers, which made her vulnerable to a foreseeable injury.

> iv.    *Affirmative Action*

In order for a plaintiff to prevail on a § 1983 claim under the "state-created danger" theory, the plaintiff must demonstrate that the state actor affirmatively placed the victim in a state of danger.  "A constitutional violation may occur when the state acts in a way that makes a

person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *Schieber*, 320 F.3d at 416. A state actor's nonfeasance is not enough. *See e.g. Burella v. City of Philadelphia*, 501 F.3d 134 (3d Cir. 2007) (holding that there was no state created danger because the plaintiff merely failed to act); *Schieber*, 320 F.3d 409 (determining that the officers were not liable because they did not affirmatively act, but failed to act). The state actor "'must have used their authority to create an opportunity that would not have otherwise existed for the third party's crime to occur.'" *Mark*, 51 F.3d at 1152 (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994).

The line between a state actor's failure to act and taking affirmative action is not always clear. The Third Circuit in *Burella* found that the defendant officers were not liable under a "state-created danger" theory. The plaintiff was a victim of continued domestic abuse by her husband, who was also a veteran of their city's police department. The plaintiff obtained numerous TRO's against her husband, but that did not stop him from continuing to harass and abuse her. The plaintiff sued the officers under § 1983 after she was shot and injured by her husband, who then shot and killed himself. The Third Circuit reasoned that there was no constitutional obligation to protect the plaintiff from her husband's abuse and that the plaintiff did not offer any facts that would establish that the officer did anything but *fail* to act by not arresting her husband.

The Third Circuit, however, held the officers liable under § 1983 in *Kneipp* because they affirmatively acted. The plaintiff and her husband were walking home after a night of drinking when they were stopped by police officers. After evaluating the plaintiff and her husband, the officers allowed the husband to continue on home. The husband testified that the only reason he

left the plaintiff with the officers was because he assumed since the plaintiff was inebriated and could not stand on her own, the officers would escort her home.  The officers did not.  Instead, they left the plaintiff to walk home by herself, but she never made it home because she fell, which knocked her unconscious.  As a result of exposure to the cold, the plaintiff suffered hypothermia, which led to permanent brain damage.  The Third Circuit reasoned that the plaintiff would not have suffered her injuries if the police officers had not intervened and sent the plaintiff's husband home.  If the plaintiff's husband had stayed with her, she would have had an escort to ensure she arrived home safely.  Therefore, a reasonable jury could have found that the officers acted affirmatively by allowing the plaintiff's husband to go home while they detained her before sending her home alone, which left the plaintiff in a more dangerous situation than if the officers had not acted.

Upon review of the factual allegations presented, the Court determines that genuine issues of material fact do exist and a reasonable jury could find that the Jersey City officers affirmatively placed Soberal in more danger than had they not intervened.  Unlike the string of cases where the Third Circuit has found police officers' failure to act does not equate to an affirmative action to constitute a "state-created danger," the Court believes the factual evidence presented here distinguish this case from the precedents set by prior cases.  *See e.g. Burella*, 501 F.3d 134; *Bright*, 443 F.3d 276; *Schieber*, 320 F.3d 409.

The Court finds the action of the Defendants in walking Soberal past Reyes in the West District - after she was served with the TRO, but before he was served with the TRO and his weapons were confiscated - an act which a reasonable jury could deem as affirmatively placing Soberal in more danger than had they not escorted her down from the second floor of the station.

Sgt. Younger observed Reyes' position when he started walking Soberal down to the first floor and instructed Reyes to remain in place.  Instead of walking Soberal out of the station by another route or back into the interview room, Sgt. Younger led her directly in front of Reyes, the very person she just had a TRO issued against, which stated that Soberal and Reyes were not to be in the same location.  Had Sgt. Younger not done this, Reyes likely would not have known that Soberal was still in the vicinity of the West District.  A reasonable jury could determine that knowing Soberal was in the station and then seeing her enabled Reyes to take his ultimately tragic actions of shooting her and then himself.  Unlike prior cases where the Defendant officers failed to act to protect the victim, the officers, here, affirmatively acted by, literally, walking Soberal into a dangerous situation.[10]

### c.    *Qualified Immunity*

Turning to the Defendant officers' claims of qualified immunity, the Court declines to grant summary judgment in favor of the Defendant officers because immunity does not apply.[11]

Qualified immunity is an affirmative defense intended to shield government officials

---

[10] As a side note, the Court also recognizes that the phone conversation between Officer Bacigalupo and Reyes wherein Officer Bacigalupo told Reyes that someone was there for him could also be considered an affirmative action that placed Soberal in more danger had Officer Bacigalupo not acted. Reyes would not have been inclined to come to the West District but for knowing that Soberal was there. Because Officer Bacigalupo is no longer part of the action, however, the Court will not include this factual evidence as part of its analysis of "state-created danger."

[11] The Defendant officers' brief, in its opening discussion, argues that qualified immunity applies to "the Borough of Freehold, Borough of Freehold Police Department and Officers Healey, Hobbs, and Mora."  Def. Brief, pg. 58.  This appears to be a gross error by counsel in drafting the brief.  The Court, for purposes of its analysis, will assume that the Defendants' counsel meant to argue that qualified immunity applies to Lt. Nalbach, Sgt. Younger, and Insp. Wolleon, in their individual capacities. Furthermore, the Court will infer that Defendants' counsel meant the *officers*, and not Reyes, were asserting the affirmative defense of qualified immunity.  *Id.*

performing discretionary functions from liability for civil damages, provided their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Municipalities and individuals sued in their official capacity are not accorded qualified immunity; only police officers sued in their individual capacities may assert this defense. *See Owen v. City of Independence*, 445 U.S. 622, 650 (1980) (rejecting the claim that municipalities are afforded qualified immunity); *W.B. v. Matula*, 67 F.3d 484, 499 (3d Cir. 1995) ("the doctrine of qualified immunity shields officials acting only in their individual capacities"). Qualified immunity is a matter of law to be decided by the Court. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) ("The court must make the ultimate determination on the availability of qualified immunity as a matter of law.").

In *Saucier v. Katz*, 533 U.S. 194 (2001), the United States Supreme Court held that a claim of qualified immunity must be analyzed using a two-step inquiry. The threshold question the court must examine is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201. If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry does not need to proceed further. *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). If the plaintiff establishes a constitutional violation, however, the court must then examine whether the right violated is "clearly established." *Saucier*, 533 U.S. at 201. More specifically, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

      Government officials are shielded from liability if they act "reasonably but mistakenly." *Anderson*, 483 U.S. at 641.  The Supreme Court has adopted an "objectively reasonable" test of the official's conduct.  A court must evaluate whether, objectively, a reasonable officer would comprehend that his actions at the time violated clearly established law.  "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action...assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Anderson*, 483 U.S. at 639.  In other words, a court must judge the reasonableness of the action "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Further, in evaluating reasonableness, a court should consider if the "actions [were] 'objectively reasonable' in light of the facts and circumstances" confronting the actor.  *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137 (1978)).

      At the time of the Defendant officers' alleged violation of Soberal's constitutional rights under the Due Process Clause, the Court has determined that the law was clearly established - the Defendant officers could be held liable under § 1983 for Soberal's injury if they created the danger that left her in a position worse-off than had they not intervened.  Although the law is fluid in what constitutes "state-created danger," it is clear that an affirmative action on the part of the officers is needed to establish a constitutional violation under § 1983.  Upon review of the totality of the circumstances, the Court believes that reasonable officers acting as the Defendant officers would have known that their conduct the night of March 3, 2003, particularly walking

Soberal directly past Reyes, violated established law.  Therefore, the Court finds that the individual Defendant officers are not entitled to qualified immunity at the summary judgment stage.

> d.    *Pendent State Law Claims*

> i.    <u>*New Jersey Tort Claims Act Notice*</u>

The Court finds Plaintiffs' second amended complaint is vague as to the state law claims they are asserting.  The complaint alleges nothing more than that because of the Defendants' "wrongful and/or negligent conduct," Reyes was able to commit an intentional homicide and as a "proximate result of being fatally shot," Soberal suffered "grievous bodily harm."  Compl. ¶¶ 91 and 93.  Plaintiffs' counsel said nothing at oral argument to elaborate on these assertions other than that "there are pendent state claims."  Tr. pg. 3:11.  Nevertheless, the Court will proceed and address these allegations under the New Jersey Tort Claims Act, N.J.S. 59:1-1 *et seq.* ("Tort Claims Act").

Section 59:8-4 of the Tort Claims Act requires:

> "A claim shall be presented by the claimant or by a person acting on his behalf and shall include...the name or names of the public entity, employee or employees causing the injury, damage or loss, *if known*...." (emphasis added)

While, ideally, a plaintiff would be certain of the identities of the parties they were serving the claim notice upon, a plaintiff is not required to know them at the time of filing the notice.  *See Henderson v. Herman*, N.J. Super. 625, 633 (N.J. Super. Ct. App. Div. 2004) ("we cannot accept that it was the intention of the Legislature that a claimant be barred from suit for such a slight

-33-

omission when the identity of the employee or employees was nearly as clear from the designation or description provided as it would have been by the inclusion of his or her name").

In *Henderson*, the plaintiffs, parents of a minor child who died due to the failure of the police dispatch and emergency medical personnel to respond to their 911 call, filed a notice of tort claims on the dispatchers.  The Appellate Division reversed the lower court's ruling that the plaintiffs failed to serve specific notice of tort claims on the dispatchers.  The court reasoned that to find otherwise would go against the underlying goals of the statute as a whole and that a description of the claimants, "rather than reciting to the public entity the names disclosed in the materials provided to them by that public entity," was sufficient to meet the requirements of N.J.S. 59:8-4.  *Id.* at 635.

"Substantial, rather than strict, compliance with the notice requirements of the Tort Claims Act may be satisfactory."  *Gaston v. State Dep't of Law & Pub. Safety*, No. 05-3006, 2006 U.S. Dist. LEXIS 17206, at *18 (D.N.J. Apr. 5, 2006) (citing *Tuckey v. Harleysville Ins. Co.*, 236 N.J. Super. 221 (App. Div. 1989)).  There exists substantial case law in New Jersey regarding what will be considered "substantial compliance."  Cases have held where plaintiffs have listed their attorney representation, the injuries sustained, and the date, time, and place of the accident, and provided that information to the potential defendants in the matter, that was enough to meet the requirements of the statute.  *See, e.g., Vargas v. Camden City Bd. of Educ.*, No. 05-778, 2006 U.S. Dist. LEXIS 13357, at *13-16 (D.N.J. Mar. 28, 2006); *Guerro v. City of Newark*, 216 N.J. Super. 66 (N.J. Super. Ct. App. Div. 1987); *Dambro v. Union County Park Comm'n*, 130 N.J. Super. 450 (N.J. Super. Ct. Law. Div. 1974).  *Compare with Lameiro v. West New York Bd. of Educ.*, 136 N.J. Super. 585 (N.J. Super. Ct. Law. Div. 1975) (holding that the

plaintiff's notice did not substantially comply with the Tort Claims Act because it merely sent a letter to the school principal asking for the name of the student who pushed plaintiff's child down the stairs).

Plaintiffs, here, timely filed their claim notice pursuant to N.J.S. 59:8-8, which requires notice to be filed within ninety-days of the injury.  The Defendants acknowledge that Plaintiffs filed the claim notice with Jersey City on April 28, 2003, well within the ninety-day requirement. Although Plaintiffs did not specifically name Insp. Wolleon or Lt. Nalbach in their claim notice, the Court finds the description of "other officers, supervisory officers and employees of the Jersey City Police Department" combined with the names of other officers on duty the night of March 3, 2003, sufficient to meet the requirement of N.J.S. 59:8-4(e).  Def. Ex. TT, pg. 3. Moreover, Plaintiffs listed their attorney representation and date, time, place, and description of the injury that occurred on March 3, 2003.  To find that the Plaintiffs did not comply with the Tort Claims Act would be contrary to the goals of the statute.  Accordingly, the common law torts alleged by Plaintiffs are not barred by the notice requirements of the Tort Claims Act.

     ii.    *New Jersey Tort Claims Act Immunity*

The Defendant municipality and officers assert they are entitled to qualified immunity pursuant to N.J.S. 59:2-3(a) and 59:3-2(a), respectively, which state, in relevant part:[12]

> "A public entity [or public employee] is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity [or employee]."

---

[12] The statutory language of N.J.S. 59:2-3 and 59:3-2 are identical, except that 59:2-3 applies to public entities and 59:3-2 applies to public employees.

-35-

New Jersey courts have interpreted these statutes, when read in conjunction with the other provisions in the statutes, to refer to "actual, high-level policymaking decisions involving the balancing of competing considerations." *Costa v. Josey*, 83 N.J. 49, 55 (N.J. 1980). The statutes are meant to protect basic policy decisionmaking, "the type made at the planning, rather than the operational level of decisionmaking." *Pacifico v. Froggatt*, 249 N.J. Super 153, 156 (N.J. Super. Ct. Law Div. 1991). Public entities and employees should be able to exercise their discretion in making these types of judgments.

The Superior Court of New Jersey provided immunity to police officers exercising discretion in their job function in *Perona v. Twp. of Mullica*, 270 N.J. Super. 19 (N.J. Super. Ct. App. Div. 1994). The plaintiffs - a husband and wife - sued two of the township's officers for failing to take the wife, who was mentally disturbed, to a screening facility after responding to a domestic disturbance complaint. The husband told the officers he had seen his wife walking along the side of a highway, showed them an apparent suicide note, and expressed concern that his wife was going to commit suicide. After evaluating the information, the officers decided they would not offer assistance. Shortly after they left the home, the wife attempted suicide by placing herself in front of oncoming traffic on the same highway her husband had observed her on earlier. The Superior Court reasoned that the officers made a "discretionary determination[]" in deciding not to take the wife to the screening facility and, thus, were afforded immunity under N.J.S. 59:3-2(b).

Adopting a broad application of the statutes, however, would seriously limit the types of acts public entities and employees are liable. "Almost all official conduct, no matter how ministerial, involves the exercise of some judgment and decisionmaking. To construe subsection

(a) that broadly...would in effect eliminate most of the liability which the Legislature clearly intended to permit when it enacted the statute." *Costa*, 83 N.J. at 60.  Furthermore, subsection (d) of N.J.S. 59:2-3 provides:[13]

> "...nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions."

A ministerial act is one that "public officials are required to perform upon a given state of facts in a prescribed manner, in obedience to the mandate of legal authority and without regard to their own judgment or opinion concerning the propriety or impropriety of the act to be performed." *Bilbilli v. Klein*, No. 02-2953, 2005 U.S. Dist. LEXIS 11464, at * 29-30 (D.N.J. June 14, 2005) (quoting *Ritter v. Castellini*, 173 N.J. Super 509, 513-14 (N.J. Super. Ct. Law. Div. 1980).

For instance, in *Wuethrich v. Delia*, 134 N.J. Super. 400 (N.J. Super. Ct. App. Div. 1975), the court declined to extend the immunity protection of N.J.S. 59:2-3 to a township police department for failing to respond to a report of the defendant exhibiting violent behavior and wielding a gun.  Twelve hours after the police department was first informed of the defendant's behavior, the defendant shot and instantly killed the decedent.  The Superior Court reasoned that the police had an obligation to investigate once they received the warnings because it "was not discretionary, but ministerial."  *Id.* at 411.  The court reads the statutes the police department relied on for immunity - N.J.S. 59:5-4, 59:5-5, and 59:2-4 - in conjunction with N.J.S. 59:2-3(d) and 59:2-2 to find that a "public entity [is] clearly liable for acts or omissions of a low-level discretionary or ministerial nature."  *Id.  See also Cadmus v. Long Branch Bd. of Educ.*, 155 N.J.

---

[13] Identically, subsection (d) of N.J.S. 59:3-2 provides: "...nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions in carrying out his ministerial functions."

Super. 42, 47 (N.J. Super. Ct. Law Div. 1977) ("the Tort Claims Act does not permit liability to

be imposed upon a public entity for the negligent execution of its duties in the absence of

tangible facts demonstrating the requisite actual or constructive awareness of the danger on the

part of the entity").

The Court, therefore, declines to apply the immunity provided by the Tort Claims Act for

public entities and employees to the Defendants.[14]  In the Court's view, the Defendants would be

immune from their discretionary decision making in whether to proceed with the processing of

Soberal's TRO after interviewing her, similar to the officers' decision not to assist the plaintiff

wife in *Perona* after considering the information before them.  Had the Defendants determined

that there was no factual basis for the application and, thus, not contacted Judge Rosen to process

and execute the TRO, if any injury arose from not processing the TRO, the Defendants would be

immune from any liability.  That is not what happened here.  The Defendants exercised their

discretionary decisionmaking and proceeded with the processing of Soberal's TRO application.

Any actions the Defendants engaged in after the point Judge Rosen granted the TRO were

ministerial, i.e. the serving of the process and the escorting of Soberal out of the West District.

The Defendants were required by the Jersey City PD policy to effectuate service of the

TRO on Soberal and Reyes, and provide Soberal with an escort home.  The Defendants are not

afforded immunity by the Tort Claims Act if they execute those ministerial functions negligently.

The Tort Claims Act was not established to shield the Defendants from failing to serve Reyes

with the TRO and confiscating his weapons while Soberal was in the same building nor was it

---

[14] The Court will not consider Plaintiffs' prior allegation of failure to train or supervise the Jersey City police officers and Reyes.  Plaintiffs' conceded in their opposition papers that they cannot support this allegation.

meant to protect the Defendants from escorting Soberal into harm's way by walking her out of the building directly past Reyes.  Furthermore, under the Tort Claims Act, a municipality can be held liable on the basis of *respondeat superior,* pursuant to N.J.S. 59:2-2(a), if its employee causes an injury by act or omission within the scope of his employment.[15]

Additionally, both Plaintiffs and the Defendant officers assert N.J.S. 59:3-14 as grounds for denying immunity and granting immunity, respectively.  N.J.S. 59:3-14 states in relevant part:

> "Nothing in this act shall exonerate a public employee from
> the full measure of recovery applicable to a person in the
> private sector if it is established that his conduct was outside
> the scope of his employment or constituted a crime, actual
> fraud, actual malice or willful misconduct."

Plaintiffs argue that a reasonable jury could find that Insp. Wolleon and Lt. Nalbach misrepresented the events of March 3, 2003 by testifying untruthfully, falsifying reports, and altering the patrol log book of Reyes and Officer Levine.  Therefore, they claim, immunity does not apply to the Defendant officers because those actions constitute crime or actual fraud.  The Defendant officers allege they are immune under the statute because there has been no showing that the Defendant officers participated in any criminal acts, fraud, actual malice, or willful misconduct.

The Court finds both parties' arguments without merit.  Plaintiffs have not provided sufficient evidence for this Court to determine that Insp. Wolleon and Lt. Nalbach committed the acts Plaintiffs allege.  As to the Defendant officers, they appear to have misinterpreted the language of the statute.  N.J.S. 59:3-14 does not qualify N.J.S. 59:3 to mean that a public

---

[15] N.J.S. 59:2-2(a) provides: "A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances."

employee is immune from *all* situations unless his conduct was outside the scope of his

employment or he commits a crime, fraud, actual malice, or willful misconduct.  Rather, a public

employee will never be granted immunity if he participates in those actions; however, merely

because his actions do not fall into one of those categories does not necessarily exempt him from

liability.  Therefore, the Court does not find this statute applies to this action.

Lastly, the Defendant municipality asserts they are immune from liability for Reyes'

criminal conduct pursuant to N.J.S. 59:2-10, which states:

> "A public entity is not liable for the acts and omissions of a
> public employee constituting a crime, actual fraud, actual
> malice, or willful misconduct."

The language of the statute is clear.  If the public employee committed a crime or intentional tort,

*respondeat superior* does not apply.  The Court finds the immunity afforded by N.J.S. 59:2-10

applies to the Defendant municipality for Reyes' actions and, therefore, grants summary

judgment in favor of the Defendant municipality as to this claim.


**V.    Conclusion**


Based on the foregoing reasons, the Court grants the Defendants, Jersey City, Director

Carter, and Chief Behrens' Motion for Summary Judgment regarding the issue of municipal

liability under 42 U.S.C. § 1983 and N.J.S. 59:2-10.   The Court denies the Defendants, Jersey

City, Director Carter, and Chief Behrens' Motion for Summary Judgment regarding the issue of

municipal liability under N.J.S. 59:1-1 *et seq.* on the basis of N.J.S. 59:2-2(a).  The Court denies

the Defendants, Insp. Wolleon, Lt. Nalbach, and Sgt. Younger's Motion for Summary Judgment

for violations of Plaintiffs' Fifth and Fourteenth Amendment substantive due process rights

under 42 U.S.C. § 1983.  Furthermore, the Court denies the Defendants, Insp. Wolleon, Lt.

Nalbach, and Sgt. Younger's Motion for Summary Judgment on the remaining torts claims under

N.J.S. 59:1-1 *et seq.*  An appropriate Order accompanies this Opinion.


Date: December 27, 2007                           /S/ JOEL A. PISANO_____
                                                  United States District Judge